**In re FLORIDA EAST COAST RY. CO.**

No. 4827–J.

United States District Court
S. D. Florida.
Jan. 22, 1949.

See also 52 F.Supp. 420.

Davis, Polk, Wardwell, Sunderland & Kiendl and Edgar G. Crossman, all of New York City, and Stockton, Ulmer & Murchison, of Jacksonville, Fla., for First & Refunding Mortgage Bondholders' Committee.

Jackson, Nash, Brophy, Barringer & Brooks and Paul B. Barringer, Jr., all of New York City, and Osborne, Copp & Markham and H. P. Osborne, all of Jacksonville, Fla., for First Mortgage Trustees.

Appleton, Rice & Perrin, Clifton S. Thomson and Charles N. Schenck III, all of New York City, and Chester Bedell, of Jacksonville, Fla., for First & Refunding Mortgage Trustees.

James F. Byrnes and Donald Russell, both of Washington, D. C., and Giles J. Patterson, of Jacksonville, Fla., for St. Joe Paper Co.

Oliver & Donnally and Willard P. Scott, all of New York City, and Milam, McIlvaine, Carroll & Wattles and Robert R. Milam, all of Jacksonville, Fla., for S. A. Lynch and associated interests.

Alexander & Green and Edward W. Bourne, all of New York City, Charles Cook Howell and Richard B. Gwathmey, both of Wilmington, N. C., and McCarthy, Lane & Howell, of Jacksonville, Fla., for Atlantic Coast Line R. Co.

Willkie, Owen, Farr, Gallagher & Walton, and Walter H. Brown, Jr., all of New York City, and Fleming, Jones, Scott & Botts and G. W. Botts, all of Jacksonville, for Seaboard Air Line Ry. Co.

Henry L. Walker, Robert N. Lowry and Sidney S. Alderman, all of Washington, D. C., and Cyril C. Copp, of Jacksonville, Fla., for Southern Ry. System.

Macfarlane, Ferguson, Allison & Kelly and Howard P. Macfarlane, all of Tampa, Fla., for F. K. Conn.

Frank L. Mulholland, Clarence M. Mulholland, and Willard H. McEwen, all of

928

Toledo, Ohio, Edward J. Hickey, Jr., of Washington, D. C., and Edwin C. Coffee, of Jacksonville, Fla., for Railway Labor Executives' Assn.

Debevoise, Plimpton & McLean and Francis T. P. Plimpton, all of New York City, and Rogers & Towers, of Jacksonville, Fla., for New York Trust Co., trustee.

Russell L. Frink, of Jacksonville, Fla., for Debtor's Trustees.

Miller Walton, of Miami, Fla. (Walton, Hubbard, Schroeder, Lantaff & Atkins, of Miami, Fla., of counsel), for W. G. Welbon and others.

SIBLEY, Circuit Judge.

After hearing much evidence and argument I have to decide whether a plan of reorganization of the Florida East Coast Railway Company under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, certified to this court by the Interstate Commerce Commission as fair and equitable, compatible with the public interest and meeting the requirements of Section 77, subs. b and e, should be approved by the court. There is on practically all the debtor Company's property a general mortgage securing a principal of $12,000,000 of bonds dated in 1909 which is not in default and not due till 1959. There is a second general mortgage dated in 1924 securing issues of refunding bonds of a principal of $45,000,000, on which an additional amount of about $35,000,000 of defaulted interest is due. There are large unsecured debts having no priority, and the Company is and has long been insolvent. A receivership in this court was secured on a creditor's bill in 1931; and the following year the trustees in the refunding mortgage moved to foreclose it in this court and secured a receivership, which was consolidated with the other. The receivers operated the railroad successfully and profitably, keeping the interest on the first mortgage of $540,000 per annum paid up and accumulating a large amount of surplus cash. In 1941 a committee representing the holders of about $30,000,000 of the refunding bonds in their behalf filed this reorganization proceeding. The Interstate Commerce Commission in due course in 1942 certified to the court a simple plan of reorganization which would have continued to carry a first mortgage and to vest the new common stock pro rata in the refunding bondholders, but it restricted the capitalization to $37,500,000. In 1943 the court disapproved the plan because the Commission had taken insufficient account of the large earnings and profits during these war years sufficient to pay off the first mortgage and leave a large surplus. In 1945 another plan was certified by which the first mortgage would be paid off out of the cash on hand, and new common stock and income bonds would be divided among the refunding bondholders. $8,700,000 more of the cash on hand was to be set apart for rehabilitation and improvement of the railroad. The reorganization and capitalization value was raised to $40,500,000. St. Joe Paper Company had by this time bought fifty-one percent of the refunding bonds, and to safeguard minority holders against any abuse of the majority control a voting trust was provided in the plan. There was a suggestion by what is known as the Lynch interest, owning some $3,000,000 of the refunding bonds, that a controlling interest be acquired by the Atlantic Coast Line Railroad Company by awarding it common stock to be paid for by new bonds of the latter, but it was repelled by the Commission because of aggressive opposition by other refunding bondholders and their threat to vote to reject the plan, and because the Coast Line's fixed charges could not in view of recent operating deficits be prudently increased. This plan, without the Coast Line control, was declared compatible with the public interest and certified for approval Jan. 8, 1945. Before the certificate became final, the Coast Line bought a large unsecured debt for a small sum and an agreement to divide any collections with the seller, and was allowed to intervene as a party in interest and present a new plan whereby in lieu of the Coast Line's acquiring a majority of voting stock to secure control, the debtor's properties should be merged into the Coast Line and the debtor's creditors should be paid cash and Coast Line securities in satisfaction of their claims. The whole matter was reopened and referred to an examiner and evidence taken especially touching the propriety of control by St. Joe Paper Company or the Coast Line. After a very lengthy discussion the Commission concluded in general terms that there would be betterment of service and economies of

operation and increased financial stability by the merger with the Coast Line, and more experience and less distraction by other interests, than if St. Joe Paper Company controlled; and that a plan of reorganization putting the Paper Company in control would not be compatible with the public interest but one putting control in the Coast Line would be compatible therewith. With modifications, the Coast Line plan was certified, by a majority of one Commissioner, on April 8, 1947. 267 I.C.C., 295–391. It was again taken under consideration however, especially on the question whether there was power under Section 77 and the Interstate Commerce Act to propose such a plan of involuntary merger, two additional Commissioners participating. The certification was adhered to by six Commissioners, the other five strongly dissenting both in law and fact. 267 I.C.C., 729–759.

Being thus of opinion that it was not compatible with the public interest for St. Joe Paper Company to own a controlling voting stock interest in the debtor's railroad a majority of the Commission, by way of defeating that control, adopted this present plan of merger which would result in St. Joe having only a relatively small amount of voting stock in the merged set-up. The plan as formulated pays off the first mortgage and distributes among the holders of the East Coast refunding bonds pro rata any "free cash" on hand at the plan's consummation, meaning thereby the accumulated earnings not needed by the railroad and not included in the valuation of the railroad property at $40,500,000; and then the debtor's entire remaining property is to be transferred to the Coast Line; and as the equitable equivalent of the bondholders' rights in the property for each $1,000 refunding bond $91.67 of cash is to be paid by the Coast Line, plus $300 par of its new mortgage bonds secured by the transferred property, and its divisional income bonds of a par of $175, and $200 in four-dollar-dividend preferred stock having voting power and participating with the common stock in dividends in excess of the fixed dividend, and one and one-third shares of no par Coast Line common stock put at $133.33. All these at par add up to $900 per bond. The pro rata share of the bond in the railroad property to be transferred at the value of $40,500,000 as fixed by the Commission both for reorganization purposes and as an upset price in case of sale is $900. But the Commission finds that common stock of the Coast Line was then selling at 55, and had recently been as low as 45. The evidence heard by me both from the advocates and opponents of the plan is that none of these securities when issued will likely be worth par. The gist of the matter is that, because the majority of the Commissioners think it not compatible with the public interest for St. Joe Paper Company to own a controlling amount of voting stock in the reorganized East Coast railroad if reorganized in the simple and natural manner several times certified by the Commission unanimously by giving all the refunding bondholders a pro rata share of its common stock, all of them must surrender the investment they have chosen and lawfully own in the East Coast property and must take in return an investment which most of them do not desire to own and do not think is an equivalent.

In the hearing before me, as in those before the Commission, the Coast Line urgently insists on the approval of the plan. It proposed it and as the Commission itself reports eagerly desires it. The Committee of New York bankers, which represented when it instituted this reorganization proceeding over $30,000,000 of the refunding bonds but now represents only $572,400, appears in support of the plan. These bankers, according to the testimony of their spokesman, sold the bonds originally, and after their default have been trying without compensation to assist their customers who bought them. They take a banker's view, that the important matter is whether the securities to be issued under the plan will probably be worth on the market more than those issued in an independent reorganization of the East Coast alone. Though they do not think any of them will be worth par, they think the Coast Line securities will be worth more. They and their clients are not interested in being stockholders or helping to run the railroad, but are seeking only to sell out as soon as possible and to the best advantage.

930

■ No one else supports the merger plan, but numerous objectors and intervenors strongly oppose it. The Southern Railway Company and the Seaboard Airline Railroad Company, which the Commission finds are competitors with the Coast Line for the traffic of the East Coast railroad at its northern terminus at Jacksonville, will be injured by giving over the East Coast to the Coast Line. The bargaining representatives of the East Coast employees contend that the employees will be injured in losing their jobs and in their seniority rights. These other railroads and their traffic and these employees are a part of the affected public whose interest must be considered by the Commission, but they have no creditor's rights or property interests and they have been considered by the Commission in determining the question of public interest. For reasons stated below, I do not think they present any special matter for the court. Their argument indeed is addressed mainly to invalidity of the plan on other grounds.

St. Joe Paper Company, holding by valid title a majority of the refunding bonds, $23,260,000, and in behalf of The Dupont Estate Trust which owns $1,740,000, attacks the plan as earnestly as the Coast Line defends it, both seeming to regard the control by stock ownership of the East Coast railroad as the principal matter involved. The Paper Company contends, among other things, that among its creditor rights in this insolvent corporation is the right to a pro rata equitable ownership of the mortgaged property, which expressly includes the franchise granted to the incorporators by the State of Florida to run a railroad between Jacksonville and Miami in that State; and that the proposed plan takes this property without due process of law, and in so far as it rests on public interest takes it for public purposes without just compensation, contrary to the provisions of the Fifth Amendment. It contends also that Section 77 properly construed does not authorize a plan of reorganization by a forced merger, and that if it does, this particular plan is not fair and equitable and does not give due effect to its creditor rights. It insists that

all these contentions are fully open for this court to decide.

The remaining refunding bondholders object strongly in several groups. One group, owning a par value of about $5,000,000, reside in and around Miami. One of them owning over three millions of bonds testifies that he bought most of his bonds after the certification by the Commission of its first plans providing for common stock ownership by the bondholders and on the faith of them; that he and his associates desire to be stockholders and to help run the railroad; that they do not wish any investment in the Coast Line, and do not regard it as the equal of the East Coast, and do not like its capital set-up; and that they will vote against the acceptance of this plan if submitted to a vote. Their counsel attacks the plan on grounds similar to those above indicated as to the Paper Company.

Another group residing at Tampa and owning above $1,000,000 of the bonds take the same position and their representative testifies they will certainly vote to reject the plan if submitted to a vote.

What is known as the Lynch interest represents over $3,000,000 of bonds, and though it introduced the Coast Line to the Commission it is strongly opposed to this plan, and will vote against it. It is not so much concerned about control as it is about the unfairness of the result, but it urges also objections similar to those of the Paper Company.

In behalf of the remaining refunding bondholders, who are unorganized, the trustee in the bond mortgage opposes approval of the plan, but does not undertake to say how these bondholders will vote.

■ The defenders of the plan contend that the court has to decide only questions of law, fact questions being settled by the Commission. The objectors contend that the court's function is to pass independently on the matters the statute submits to it, whether involving law or fact, not being bound by the conclusions reached by the Commission in the exercise of its functions. Neither view

is altogether correct. I think the statutory provisions are to be followed as written, Commission and court each acting in the sphere assigned. By Section 77, sub. d the Commission has the duty to formulate and approve a plan of reorganization which may be different from any which has been proposed by parties in interest, which "will in its opinion meet with the requirements of subsections (b) and (e) of this section, and will be compatible with the public interest; or it shall render a report and order in which it shall refuse to approve any plan", stating fully the reasons for its conclusions. This is the only way in which a plan can come to the court, and the court cannot alter it. Subsection e states the function of the court, requiring notice to be given "all parties in interest" of a time to file their objections in writing to the plan and their claims for equitable treatment. If such objections and claims are filed the judge shall hear them and approve the plan "if satisfied that: (1) It complies with the provisions of subsection (b) of this section, is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders;" besides other matters not here important. "If the judge shall not approve the plan, he shall file an opinion, stating his conclusions and the reasons therefor, and he shall enter an order in which he may either dismiss the proceedings, or in his discretion and on motion of any party in interest refer the proceedings back to the Commission for further action," transmitting to it a copy of any evidence he received. If he approves, the plan goes back to the Commission for submission to the proper classes affected for their acceptance or rejection; the result of the vote is certified to the judge, and if two-thirds in amount of each class affected accept it, the judge shall confirm the plan; but if not so accepted the judge may after another hearing confirm it anyhow, if satisfied that it gives a fair and equitable equivalent of those rejecting it

and that the rejection is not reasonably justified, and that the plan does conform to the requirements for its previous approval by the court. Neither in the hearing for approval, nor in that for confirmation notwithstanding rejection, is the judge required to consider compatibility with the public interest; though the Commission is so required. At the end of Subsection e it is provided that if it shall be necessary to determine the value of any property for any purpose the Commission shall determine the value and certify it to the court, observing certain standards as to the property used in railroad operation. I conclude that the matter of compatibility with the public interest of a plan is left to the opinion of the Commission and is not to be reviewed by the judge. Also that certifications of value by the Commission are in general final if the legal standards have been observed. Both are within the peculiar expertness of the Commission. An exception may exist if the judge is investigating a question of Constitutional right which transcends the statute, for such are always judicial rather than administrative questions. And on the matters about which the statute says the judge must be satisfied in order to approve a plan or confirm it over rejection, he has the right to make his independent investigation and is not bound by the conclusions of the Commission thereon. That the judge is not restricted to the facts certified by the Commission but may take additional evidence, is shown by the requirement that if the matter is sent back to the Commission a copy of the additional evidence shall be sent to the Commission. What is fair and equitable and what gives due recognition to the rights of each class of creditors and stockholders, and what is the law of the land, are matters of a judicial nature and within the peculiar expertness of the courts. On them the judge has the last word. While reorganization is the object of Section 77, it is safeguarded by the requirement of approval of the plan by both Commission and judge, and if that cannot be secured the statute itself requires that the proceeding be dismissed and the debtor and his estate be remitted to a previous receivership, if any. So in-

this hearing, much additional testimony has been taken. I have no function to review the matter of compatibility with the public interest of the plan; or the valuation of the property involved unless on the question of unconstitutional taking of it; but I should independently consider those matters which the statute requires me ·to be satisfied about, in the light of the new evidence concerning them.

■ Turning next to some vital questions of law which have been pressed, I do not think it matters whether the Coast Line as an unsecured creditor (which class, along with the stockholders, has been found to have no interest) had a right to present a plan. The Commission took note of it, modified it substantially and adopted it. The Commission had the right to propose a plan not presented by any party in interest. This plan comes to the court as the plan or proposal of the Commission.

■ It is very earnestly argued that Subsection b which gives the specifications for a plan, in saying it "may include the transfer of any interest in or control of all or any part of the property of the debtor to another corporation or corporations, the merger or consolidation of the debtor with another corporation," etc., does not mean a forced merger, which the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., has never permitted the Commission to compel, though Congress has often considered the matter. The history of the legislation in adopting Section 77 in 1933, is pointed to as showing that Congress was then concerned that no such thing was to be done under Section 77; and so again in 1935 when the section was revised; and that the reference to the Interstate Commerce Act in Subsection f which the Commission thinks applies only to its actions after confirmations of a plan, was intended to apply throughout and became accidentally misplaced in redrafting the Act. Without reciting the history, I think this contention is true. Of late years courts have perhaps gone too far in using legislative history in a very loose way to supplement or change an Act as written. If this question related directly to the liberties or property of the people I would be loath to do it now. But it relates to the extent of the power granted by Congress to its own agent. And the Interstate Commerce Act can be construed with Section 77 to ascertain what Congress really meant by a railroad "merger or consolidation", and whether it meant one consented to by both parties to it. No one would contend that the Coast Line could be forced. But. the Commission argues that this debtor has also consented, because its stockholders have not appeared to object. I think that does not follow. It is expressly found that the debtor's insolvency is such that the stockholders are not interested parties. The debtor, its property and affairs now belong in equity to the creditors, and more specifically to the refunding bondholders. The full jurisdiction and control over them is in this court. The refunding bondholders by an overwhelming majority do not consent. If the court has the power as a court of bankruptcy to consent for them, under the circumstances of this case it should refuse to do so. I do not think Congress intended to force a merger undesired by the majority in amount of the affected parties by permitting a merger to be part of a plan. This conclusion makes it unnecessary to determine whether the court's power in bankruptcy could be extended to force a merger consistently with the Fifth Amendment. It also ends this plan. But I am assured in argument that the decision if made either way will be appealed, so it will be useful to decide the merits of the plan, if it is hereafter held that a forced merger is lawful.

■ I conclude also to disapprove the plan if lawful, because it is testified under oath and is plainly apparent that it will be rejected almost unanimously by the refunding bondholders. Only $572,400 of bonds out of $45,000,000, about 1.3 percent, say by their committee that they will probably accept. Unless on a vote 66⅔ percent accept, I would not be bound to confirm the plan, and I would not confirm it notwithstanding its rejection because I think the objectors are reasonably justified in objecting and not mere obstructors. Ordinarily this conclusion would be premature because the vote has not been taken and objectors might change their minds

or sell out. But the atmosphere of this trial and the feeling manifested satisfy me absolutely that there will be no material change. It is perfectly futile to waste time and effort to go further with the matter.

I conclude also that the plan is not fair and equitable and does not afford due recognition to the rights of the refunding bondholders. These bondholders originally had a general mortgage covering railroad property, franchise, and income, with a right to a receivership on default to collect the income, and to a decree of foreclosure and a judicial sale; and the right to bid for and buy the property if they wished and made the highest and best bid. They got the receivership, and it was extraordinarily successful, not only maintaining the railroad in operation and carrying the first mortgage without default, but accumulating so much cash not needed for railroad purposes as to enable a third of the first mortgage bonds, $4,000,000, to be bought in, and four coupons of the refunding bonds to be paid, $4,500,000. Diesel engines have been bought, and new cars, an unprofitable extension of the road eliminated at an outlay of about $1,000,000, and the main line shortened by a money saving cutoff at an outlay of about $1,000,000; and a program of relaying the tracks with new and heavier rail has been two-thirds carried out and enough money set aside to finish the outlay, being over $5,000,000; and there is enough cash on hand now to pay off the remaining $8,000,000 of first mortgage bonds, as the present plan proposes. This railroad property is in equity the property of the refunding bondholders who replace practically the stockholders as owners. On a reorganization they would naturally receive the common stock pro rata. All the plans approved by the Commission save the present one so provided. With that set-up it would not much matter what reorganization value and total capitalization was fixed; for the common stockholders would get the surplus earnings. Most of the bondholders wish to continue to own and run the railroad. Many of them bought bonds during this proceeding with that purpose, as they had a right to do. The Commission indicates that the fact that they bought below par affects in equity their standing. That is incorrect. Each took all the rights of his vendor, so that original purchasers of bonds at par and subsequent purchasers below par, and even those who may have had bonds given them, stand alike. The debtor got the same money for each bond and owes the full amount on each. This was determined in a railroad reorganization in Georgia, Florida and Alabama R. Co. v. Bankers Trust Co., 5 Cir., 170 F.2d 733, recently decided by the Court of Appeals of this Circuit, where certain purchasers of bonds paid less than par and paid nothing for defaulted coupons, but were allowed to prove the full principal and coupon interest. But the Commission, within its province, though by a bare majority, has held that the public interest prevents St. Joe Paper Company from holding a majority of common stock, and therefore proposes that no bondholder can have the common stock he desires and expected, but all must sell their equitable rights in this property, and must take in exchange that which is not money and which they do not desire to have. This seems to me to be unfair, inequitable, and not a due recognition of their rights. Assuming that a forced merger is within the provisions of Section 77 and within constitutional bankruptcy power, it ought to be a last resort. There is no necessity for it here, for all that hinders a reorganization by a less drastic plan is that St. Joe Paper Company has bought too many bonds and become entitled to too much common stock under the former plans. A voting trust to prevent its exercise of majority stock control was adopted by the Commission in one plan. There might be devised a plan under which some of this stock should be deprived of voting power or awarded to other stockholders who in the Commission's opinion could properly hold it consistently with public interest, compensating St. Joe Paper Company with other values. I do not see that any situation is here presented which can be said to make this plan the only possible one, if that could render it fair and equitable.

This case is not as though the merging corporations were affiliates, and members

of the same corporate family already. In such a case there is really a mere simplification of corporate organization of interests already related. The Coast Line, though an unsecured creditor, is really a stranger in interest, having been found to have no interest in the railroad property to be reorganized.

Yet further, while deferring to the finding that the valuation of the railroad property as fixed by the Commission is equalled by that of the Coast Line securities, I am impressed that evidence produced before me, if it had been before the Commission, might have produced a different result. The materials for some of it already existed, but were not assembled for or considered by the Commission, and some relate to occurrences since it made its finding. I am only confused by the accountants' comparisons in terms of dollars after "adjustments" more or less plausible by which they have reached contrary conclusions; but I am impressed by undisputed facts of tonnage hauled, population increases, and other progressive improvements each year up to this one, showing that the territory of the East Coast is going steadily forward at a faster pace than the general territory served by the Coast Line; that by the testimony of the Coast Line high officials its railroads have for the past three years had deficits in operating revenues, so that the system has been dependent on non-operating revenues, while the East Coast has consistently continued to net more than the $1,500,000 the Commission has fixed as its normal rate. This gives these bondholders, regardless of intricate bookkeeping, a right to feel that they have a better railroad than the average of the Coast Line. The very aggressiveness of the Coast Line in proposing and defending this plan indicates that the Coast Line thinks it is getting a bargain; that what it gets is not the mere equivalent of what it pays, but much more. There seems, too, to be a fault in the Commission's finding of equivalency. The Commission recognized the necessity of participation as common stockholders in the merger entitling these bondholders in good years to a chance to recoup their losses by increased dividends. They considered that one and a third shares of common stock per bond was inadequate participation, and modified the Coast Line plan by making the two shares of preferred stock to be participating as to dividends and to carry voting powers, and so equivalent to common stock. But it was overlooked that the plan makes the preferred stock callable at par at any time, on thirty days notice, so that if good years were really making it pay, it could be called and the dividends kept by the System, these new stockholders being left with only one and a third shares of voting and high earning stock instead of the three and a third shares the plan is supposed to give them. I have no right to make new valuations, but these considerations further move me to disapprove the plan as not fair and equitable.

For all these reasons the plan of reorganization now under consideration is disapproved and rejected by the court. If the Commission continues to think that St. Joe Paper Company cannot compatibly with the public interest be made the holder of the majority of the voting stock in an internal reorganization of the debtor, some plan may still be devised by it to relieve this difficulty, as by using a voting trust, or providing for a part of the Paper Company's common stock to have no voting right so long as it is owned by the Paper Company and would give it voting control. This, while limiting somewhat the creditor rights of the Paper Company, is necessitated by its own act in overbuying refunding bonds, and might be more equitable than to defeat the similar rights of others who have done nothing amiss. I therefore overrule the pending motions to dismiss the proceedings and grant those which ask that the proceedings be referred back to the Commission for further effort to make a proper plan.

As to the allowance of expenses and compensation for services from Feb. 15, 1945, through May 15, 1948, in preparing a plan, I will defer action until the Commission presents another plan or reports that none can be made. In view of

the very thorough and repeated consideration given this debtor's affairs, already, this should not take long. The Commission has not yet fixed maximum limits for all the claims, and during the period named it seems to me that the efforts put forth were not altogether in aid of formulating a fair and equitable plan of reorganization, but to some extent were a partisan struggle for control which ought to be paid for by clients rather than by the debtor's estate. Of that the Commission can judge better than I. I refer back to the Commission for reconsideration and completion the fixing of these maximum limits, and to cover the further efforts to aid the Commission to achieve a plan.

Let the Commission be forthwith furnished with a copy of this opinion and order and of the evidence taken before me in this hearing.