**ATLANTIC COAST LINE R. CO. et al. v. ST. JOE PAPER CO. et al.**

**No. 12821.**

United States Court of Appeals Fifth Circuit.

Jan. 17, 1950.

Writ of Certiorari Denied April 3, 1950.

See 70 S.Ct. 627.

Edward W. Bourne, Edgar G. Crossman, New York City, Charles Cook Howell, Wilmington, N. C., Charles Cook Howell, Jr., Jacksonville, Fla., Charles H. Murchison, and Herman Ulmer, Jacksonville, Fla. and Washington, D. C., for appellants.

Sidney S. Alderman, and Edward J. Hickey, Jr., Washington, D. C., Clifton S. Thomson, New York City, Miller Walton, Miami, Fla., Robt. R. Milam, Jacksonville, Fla., Willard P. Scott, New York City, Howard P. Macfarlane, Tampa, Fla., James F. Byrnes, Spartanburg, S. C., Giles J. Patterson, Jacksonville, Fla., Harold J. Gallagher and Walter H. Brown Jr., New York City, James B. McDonough, Jr., Norfolk, Va., G. W. Botts, Jacksonville, Fla., Donald S. Russell, Spartanburg, S. C., for appellees.

Before HUTCHESON, Chief Judge, HOLMES, and RUSSELL, Circuit Judges.

HUTCHESON, Chief Judge.

Entered, in the Florida East Coast Railroad Company debtor proceeding, for the reasons given in his accompanying opinion,[1] and on the record made before the Interstate Commerce Commission,[2] supplemented by additional testimony[3] taken before the trial judge, the order appealed from: disapproved a plan[4] of reorganization which had been modified, adopted, and approved by the Interstate Commerce Commission, and certified by it to the court; and referred the proceedings back to the commission for further effort to make a proper plan.

Appellants are the Coast Line Co., an unsecured creditor and the proposer of the plan, who takes the laboring oar in its defense, and its small but faithful ally, the Deposit Committee.[5] Here, by brief and without value (267 I. C. C. 756); that the equipment obligations should be assumed (267 I. C. C. 749); that the first mortgage bonds should be paid in cash from the debtor's estate, (267 I. C. C. 756); and that everything distributable under the plan would go to the holders of the first and refunding mortgage bonds, except what might be distributed to the holders of unsecured claims in respect of assets which may be unmortgaged.

The plan provides:

(1) All excess cash in the estate shall be distributed to the holders of the first and refunding mortgage bonds, (267 I.C.C., 749);

(2) All the balance of the estate, including the railroad, shall be vested in the Atlantic Coast Line Railroad Company by merger, consolidation, or transfer, in exchange for cash to be paid by the Atlantic Coast Line and securities to be issued by the Atlantic Coast Line as follows (267 I. C. C. 748, 750-754):

| | |
|---|---:|
| Cash | $ 4,125,000 |
| Divisional First Mortgage fixed interest 3½% bonds | 13,500,000 |
| Divisional Second Mortgage Income 4½% bonds | 7,875,000 |
| Participating Cumulative 4% Preferred Stock | 9,000,000 |
| Common Stock (stated at $100 per share) | 6,000,000 |
| Total | $40,500,000 |

---

1. These were: (1) That the provision of the plan for a forced merger with Atlantic Coast Line, over the objection of an overwhelming majority of the bondholders of the debtor, was not in accordance with statutory provisions and, therefore, beyond the power of the Commission to propose and approve.

   (2) That if wrong in this and the proposed plan is a lawful one, the court should not approve it because it is clear that if it is approved, all of the opponents of it will oppose its confirmation, and since the objectors are reasonably justified in objecting to it and are not merely obstructors, and the court ought not to, and would not, confirm it over their objections, approval of it now would be vain.

   (3) That the plan is not fair and equitable and does not afford due recognition to the rights of refunding bondholders. In re Florida East Coast, D.C., 81 F. Supp. 926.

2. Reports and orders of the Interstate Commerce Commission, Florida East Coast Ry. Co. Reorganization, Finance Docket 13,170: April 6, 1942, 252 I.C.C. 423; Aug. 10, 1942, 252 I. C. C. 731; Jan. 8, 1945, 266 I. C. C. 151-193; April 8, 1947, 267 I. C. C. 2950391; Mar. 25, 1948, 267 I. C. C. 729-59; and the records of the Commission out of which the reports and orders arose.

3. This consisted of the testimony of several witnesses and the introduction of many exhibits.

4. The Commission, without objection from anyone, found the capital stock to be

5. This committee now represents only $572,400 principal amount out of the $45,000,000 principal and $32,000,000 accrued defaulted interest.

oral argument, they insist: that on the record made, none of the reasons given by the trial judge are valid; that, in rejecting the plan, the trial judge exceeded the authority conferred upon him by statute; and that in the reasons given he grievously erred.

Appellees, who have appeared by briefs and oral argument, are: all of the bond holders [6] (except those represented by the Deposit Committee and the owners of about $8,000,000 in principal amount, who, except as the trustees under the mortgage securing their bonds may be said to represent them, have made no appearance); the mortgage trustees; two railroad companies, the Southern Railway System Lines and Seaboard Airline Railroad Company; and Railway Labor Executive Association.

Making common cause against appellants, in support of the particular reason or reasons given by the judge which each espouses, all are equally insistent that, in disapproving the plan, the judge acted within the scope of his authority and rightly, and that his order must, and should be, affirmed.

Appellants citing the Western Pacific, the Milwaukee, and the Denver cases,[7] take

an exceedingly small and dim view of the powers and functions accorded to the trial judge by Section 77, sub. e of the Bankruptcy Act, 11 U.S.C.A. § 205, sub. e, a very large and generous one of the powers of the commission, under Section 77, sub. d. They take an equally large and generous view of the powers of this court as an appellate court. Citing in support Sec. 24, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 47, sub. a, and In re Chicago, R. I. & P. Ry. Co., 7 Cir., 160 F.2d 942, they invoke those powers to bring to a speedy end in this court, by a judgment approving the plan, a proceeding which, in the commission and the courts, has been dragging its slow length along since 1941.

Appellees, on their part, invoking the same authorities relied on by appellants, and, in addition, the authorities cited in the margin,[8] and pointing to the clear and unambiguous language of Sec. 77, sub. e of the Bankruptcy Act, take large and generous views of the powers of the trial judge, and, quoting from the Milwaukee case, 318 U.S. at page 564, 63 S.Ct. at page 748, 87 L.Ed. 959,[9] the Denver case, 322 U.S. at

6. Bond holders of First and Refunding bonds, who have appeared:
St. Joe Paper Co. circ. ...............$25,000,000 principal
W. G. Welbon, et al. circ. ............. 4,643,000 "
F. K. Conn, et al., circ. ............... 1,500,000 "
Lynch Interests circ. .................. 3,500,000 "

7. Ecker v. Western Pac. R. R. Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892; Group of Institutional Investors v. Chicago, M. St. P. & Pac. R. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959; and R. F. C. v. Denver & R. G. W. R. Co., 328 U.S. 495, 66 S.Ct. 1282, 1384, 90 L.Ed. 1400.

8. Benton v. Callaway, 5 Cir., 165 F.2d 877; Insurance Group Committee v. Denver, 329 U.S. 607, 67 S.Ct. 583, 91 L.Ed. 547; Comstock v. Group of Institutional Investors, 8 Cir., 163 F.2d 350, affirmed 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 1911.

9. "We would have quite a different problem, if the District Court had failed to perform the functions which § 77, sub. e, places upon it. But it cannot be said that there was any such failure here.

The District Court satisfied itself that the principles of priority as applied to these facts were respected. See [In re Chicago, M. St. P. & P. R. Co., D. C.] 36 F.Supp. [193] pp. 202–203, 211–212. Since such a determination rests in the realm of judgment rather than mathematics, there is an area for disagreement. But we are not performing the functions of the District Court under § 77 sub. e. Our role on review is a limited one. It is not enough to reverse the District Court that we might have appraised the facts somewhat differently. If there is warrant for the action of the District Court, our task on review is at an end." Group of Institutional Investors v. Chicago, Milwaukee, St. P. & Pac., 318 U.S. 523, 63 S.Ct. 727, 748, 87 L.Ed. 959.

page 533, 66 S.Ct. at page 1302, 90 L.Ed. 1400,[10] and the case of Comstock, 8 Cir., 163 F.2d 350, at page 357,[11] dim and meager views of our power to reverse him. Pointing to the limitations imposed by Rule 52 (a), Federal Rules of Civil Procedure, 28 U.S.C.A., upon our power of review, they insist that, if, as ought not to be the case, we should not fully agree with them, circumscribed and limited as our function is, it is our duty upon this record to affirm the finding and order of the trial judge, that indeed, it is beyond our power to do otherwise.

They particularly insist that whatever may be said of the first two reasons the trial judge gave for not approving the plan, the third, his overall finding and decision, that the plan was not fair and equitable, and did not give due and just consideration to the claims of the bondholders, is fully supported on the record and any other judgment would do violence to both the letter and the spirit of applicable constitutional and statutory principles.

To support their varying views, appellants and appellees have labored mightily, producing together more than 1000 pages of briefs and citing and quoting many cases. The Coast Line contributed 511 pages, its small but earnest ally 13, while appellees have been responsible for 575 pages. In addition they have submitted a printed record of 1000 pages and the vast record of the proceedings before the commission.

It might be supposed that, as presented to us, the case would seem intricate and greatly complicated, and that for us to set it out in its essence and make our determination upon it would require a long and wordy opinion. The contrary is, however, true. What is material in the case, as it comes to and stands before us, and what we should do and say about it, may be set down in comparatively small compass.

Florida East Coast, the debtor, has a principal line between Jacksonville and Miami, and other branches or extensions. The railroad lines of the Atlantic Coast Line include a double track main line between Richmond and Jacksonville, and main lines extending from Jacksonville to Miami, Birmingham, and Atlanta. The Coast Line, long before it began to view the debtor with a covetous eye and to go about to possess it, had close relations with the Florida East Coast, whose main line from Jacksonville to Miami is geographically an extension of the Coast Line. Of the East Coast interchanges at Jacksonville, almost 100 percent of the passenger interchanges and about 50 percent of the freight interchanges are with the Coast Line.

If, therefore, the plan, in addition to being acceptable to Coast Line and to the majority of the Commission, were acceptable to the bondholders, approval of it would be a matter of course, its consummation would be natural and reasonable, and

10. "The grounds accepted by us in former sections of this opinion as sustaining, as of Jan. 1, 1943, the valuation of the road, the allocation of the securities, and the treatment of cash, war earnings and capital reductions establish that for the act of confirmation on November 29, 1944, over the objection of the General bondholders, the finding of the judge that the plan then made 'adequate provision for fair and equitable treatment' of the dissenters was justified. [In re Denver & R. G. W. R. Co., D.C.] 62 F.Supp. [384] at 390. In view of the district judges familiarity with the reorganization, this finding has especial weight with us. See [Rule 52, F. R. C. P.] There is no doubt that the plan then conformed to subsection b and the other requirements of the first paragraph of subsection (e)." R. F. C. v. Denver & R. G. W. R. Co., 328 U.S. 495, 66 S.Ct. 1282, 1302, 90 L.Ed. 1400.

11. "On this appeal the case is stated for the appellant in substantial disregard of the findings of the trial court and practically as though the case was here to be tried by this court de novo on the voluminous evidence. This court must decline to assume that function. We may not set aside the findings of facts which have been made by the trial court, who in this case had more than ordinary opportunity to judge of the credibility of the witnesses, unless such findings were clearly erroneous. Federal Rules Civil Procedure, rule 52(a), 28 U.S.C.A. following section 723c; General Orders in Bankruptcy Nos. 36 and 49, 11 U.S.C.A. following Section 53." Comstock v. Group, of Institutional Investors, 8 Cir., 163 F.2d 350, 357.

there would be no difficulty in law or in fact in the way of the proposed merger.

But the exact contrary is the case. Less than 2 percent of the bondholders have appeared in favor of the plan, the mortgage trustees for all of the bondholders vigorously oppose it, and all of the appearing bondholders violently oppose it. In addition, the plan is opposed to the proposed findings of the examiner, based upon his long and carefully considered report,[12] is a complete reversal of the unanimous finding and order of the commission of January 8, 1945, and is opposed by five of the eleven commissioners and by the findings of the trial judge.

If, then, the case, as it comes here, presented the ordinary picture of a plan for internal reorganization, consented to by some and opposed by others of the owners of the property to be thus internally reorganized, a clear case would have to be made against the trial judge's findings, and we should hesitate long before disagreeing with him.

But this is not at all the picture the record presented.

The case we have here is that of one railroad company coveting, and pressing to possess, a competing debtor railroad company, against the wishes of 98 percent of the equitable owners of the debtor and over their violent objections, that consummation of the plan will result in depriving them of their property without just compensation. In pressing these objections, some of the bondholders contend that an internal reorganization would better protect their interests, while all of them insist that questions of internal reorganization, as opposed to a forced merger, aside, the amount the covetous one agrees to pay for the forced expropriation is neither fair nor equitable.

Such a picture certainly suggested to the trial judge the necessity for a thorough understanding of the real nature and purpose of the plan and its effects upon the objecting bondholders, that is as to whether it is as fair and equitable to them as an internal reorganization would be, and, therefore, really protects them. It suggested, too, the necessity for a full understanding of the pressures back of, and the reasons for, forcing such a plan over the objections of those whose property was being taken for the benefit of the Coast Line. Indeed, when the concern of the Congress, to protect those owning and interested in the debtor, evidenced in the emphasis, in Sec. 77, sub. e, the "cram down" section, as appellants call it, upon consulting with the creditors of the debtor and obtaining the acceptances of more than two-thirds, is considered, it may be said that such understanding was demanded of him. When, too, the concern of the courts with the interests of the owners and creditors of the debtor, evidenced by the "absolute priority" rule, the rule of the Boyd case (Boyd v. Northern Pac. R. Co.), 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, is taken into consideration the conclusion becomes inescapable that where, as here, it appears that substantially all the creditors are arrayed against the plan, the act, requiring the judge to be satisfied before approving the plan, as fair and equitable, imposed upon the trial judge in this case a primary and most exacting duty.

This duty was, in according due weight to the determination of the commission on that issue, that the plan was fair and equitable to the bondholders, to subject the proceedings to the closest scrutiny, to find out whether this determination was lawfully and constitutionally arrived at, that is, whether it was arrived at with a clear vision of, and an eye single to, that issue or, as appellees claim is the case, it was arrived at with a vision foreshortened by a too intense regard of, and preoccupation with, the question of which should control the debtor, St. Joe or the Coast Line.

He should do this, not to differ from, or take issue with, the view that the majority, rather than the minority, of the commission has rightly decided the public interest matter. He should do it to ascertain whether the majority of the commission has subordinated its determination, that the plan is fair and equitable, to, or weighted that determination with, considerations of its bearing and effect upon its finding that

---

12. Record, Vol. 3, pp. 734–847.

the property must be merged with Coast Line. He should particularly seek to ascertain whether, as a result of this subordination and weighting, the determination of what is fair and equitable to the bondholders has been reached at a sacrifice of the private interests in order to give effect to the supposed dominant public interest that Coast Line should have the properties.

If, upon such scrutiny of the record, it appeared to the trial judge: that there was such preoccupation by the majority with its supposed dilemma, Coast Line or St. Joe, or with any other interest or concern, except the one of dealing justly and fairly with the bondholders of the debtors; that it has prevented or occluded the clear view of them the law requires the commission to have and take; and that, as a result, the constitutional and legal rights of the bondholders have been unfairly cut down to fit them into the Coast Line public interest pattern the commission majority has determined upon; he was not only authorized but required to disregard the commission's findings, that the plan was fair and equitable, in favor of his own, that the plan was not.

It is quite clear, too, that, in reviewing the findings of the trial judge upon such a record, it would be our duty to accord full weight to his conclusions that the plan was not fair and unless they are found, as a matter of law, to be wholly wrong, or, as matter of fact, to be clearly erroneous,

these conclusions and the order based on them should be sustained.

Reviewing this record, therefore, in the light of these principles, taking note of its tremendous overemphasis on and the preoccupation of, the commission [13] with the struggle on the one hand of the St. Joe Paper Co., and on the other, of Coast Line for control of the debtor, with its subordination of the primary question of the legal and equitable rights of the bondholders as such, we are left in no doubt that the trial judge was right, for these reasons and for the other reasons that he gave, in disapproving the plan as not fair and equitable and not affording due recognition to the rights of the bondholders. Indeed, we are of the opinion that a contrary holding could not have been sustained and that the order declining to approve the plan and referring the proceeding back to the commission must be affirmed.

In view, however, of the additional reasons the trial judge assigned for disapproving the plan and of the fact that the matter will go back to the commission for further proceedings, we think we should say something of those reasons.

With the first reason, as broadly put by the trial judge, that, because the plan provided, over the objection of the bondholders, for merging the debtor with Coast Line, without having the properties put up for sale, it would not be lawful under the statute, we cannot agree. It is true that since agreement of at least two-thirds of

13. In the third supplemental report, the commission majority stated; "Control must be awarded here to the Coast Line or to the DuPont Estate, for no other proposal for disposition of the debtor's property has been presented to us".

To the suggestion that, if there is to be no internal reorganization, there should be a sale, the commission further stated: "In any plan purporting to transfer control of the debtor to the Coast Line a provision permitting a judicial sale of the mortgaged property such as permitted in Alton Railroad Co., Reorganization, 261 I. C. C. 344 * * * would defeat such a transfer since the Coast Line obviously could not successfully compete in bidding with the debtor first and refunding bondholders, a large majority of whom desire to retain control".

In addition, the commission to support its finding that the plan was fair to the bondholders continually referred to the fact which is without bearing on the issue that many of the bondholders had bought their bonds at a quite small price.

The district judge pointed out that this was wholly immaterial and cited Georgia, F. & A. R. Co. v. Bankers Trust Co., 5 Cir., 170 F.2d 733, in support. Not at all contesting the conclusion of the commission that in the public interest St. Joe ought not to have control, he clearly pointed out the error of the commission's assumption that an internal reorganization could not be had without vesting control of the railroad in St. Joe.

those having a legitimate interest in the reorganization of the debtor is made by the statute a matter of prime importance, the opposition to a plan of all those interested in the debtor would normally make the plan *prima facie* suspect. In such a situation, unless there is a clear showing that the opposition is itself unjust and unfair, that is, based upon considerations alien to the protection of the legitimate private interest of the holders, or there is clear and convincing proof that the provisions of the plan are fair and equitable and the opposition is unwarranted, such a plan ought not to be pressed upon, it ought not to be approved by, the trial judge.

We are in no doubt, however, that a plan providing for what the trial judge broadly called a "forced merger", that is, a merger over the objection of the debtor and all its creditors, might be lawfully certified to the court and lawfully approved and confirmed by it. The trial judge, while using language broader than the precise determination before him required, recognized that this was so, in holding that the fact found by the commission, that St. Joe bought the bonds it holds with the desire and purpose to use them to own, control, and run the debtor railroad, and that the plan for merger with the Coast Line would frustrate that desire and purpose, was not a reason for refusing to approve the plan. He particularly recognized that if the evidence clearly established that the whole opposition to the plan, instead of being based upon the legitimate view that the merger with the Coast Line would not be as favorable to the rights and interest of the bondholders as an internal reorganization would be, and that the securities to be delivered to the owner under the forced merger plan are not the substantial equivalents of those they hold, was based upon such irrelevancies as desire for control, these objections would not be valid objections and the plan should be approved and confirmed over them.

The evidence establishes conclusively that this is not the case with the objections here. Owners of something like $10,-000,000 in amount of bonds are here protesting the plan as unfair to them, none of

them asking that control of the debtor be given to St. Joe. Some of them are, indeed, insisting that an internal reorganization would be better for their interests than an outside merger. All, however, are insisting that the proposed plan will be a forced merger giving to the Coast Line, at the expense of depriving the bondholders of their fair and equitable rights, properties worth far more than Coast Line is being required under the plan to pay the bondholders for them.

The commission has had these matters under consideration for now over a period of eight years, during which period the debtor's properties and condition have greatly improved. In that period the commission has changed and vacillated, and vacillated and changed, and vacillated again, and now the majority, for reasons difficult to follow, seems to have developed an *idee fixe* that the only thing the commission can do in the premises is to accept either the plan for Coast Line control or one for St. Joe control. Unwilling to vest control in St. Joe, and apparently closing its eyes to any other solution, it seems in desperation to have seized upon the Coast Line offer as its only way out.

We agree with the trial judge that upon the facts of record and his findings, and in the light of this determination of the commission, such a forced merger as is now proposed is contrary to the statute.

In remanding the case, however, for further proceedings, we remand it for the purpose of working out a really fair and equitable plan and without prejudice in doing so to the due consideration of any fair and equitable plan for bringing this matter to an end, including such a plan providing for a merger with, or sale to, the Coast Line either with or without the approval of the security holders.

There remains for consideration the other reason given by the trial judge, and so much complained of by the appellant as premature, that even if such a forced merger were legal, he would not approve the plan, because it was perfectly clear: that the 66⅔ per cent consent required for its confirmation could not be obtained; that

their objections were reasonable; and that he ought not, and would not, therefore, under the "cram down" provision, force a confirmation.

We agree with appellant: that normally the "cram down" provision is not reached for consideration until after a plan has been approved by the court and is up for confirmation by it; that when that point is reached, each objection is examined not from the standpoint of fairness of the plan as a whole, but from that of its fairness as applied to the particular objector; and that technically, therefore, the trial judge, made an anticipatory ruling on a matter not then before him. In substance, though, we agree with the trial judge, that since it appeared not merely that perhaps some of the required majorities could not be obtained, but that there will certainly be almost unanimous opposition from all categories, there was nothing seriously amiss in his action in ruling anticipatorily as he did.

The Congress brigaded commission and court in railroad reorganization proceedings, not because the Congress has determined to paramount the public interest to the point of taking the property of the debtor and of its security holders without just compensation and by administrative fiat, but for quite contrary reasons. By a plan which combines the functions and efforts of commission and court, the Congress went about to secure, not the destruction or subordination of the private interests of security holders of the debtor to the interest of the public in its future control, but the protection of private and public interest without sacrifice of each to the other.

Assured, by employing the facilities and skills of the commission, of securing just and careful value appraisements and adequate consideration of the public interest, it yet made sure that in pursuing the interests of the public, the constitutional rights of the citizen would not be invaded or impaired. It did this by confiding final approval to the courts,[14] and requiring the court to be satisfied, before approving it, that the plan "is fair and equitable and affords due recognition to the rights of each class of creditors and stockholders".

It was to meet the exigencies of cases like the one presented here that Congress enacted this law. In refusing to approve the plan and returning it to the commission for further and more careful consideration and recognition of the rights and equities of the bondholders, the trial judge has determined the matter in accord with the intention of the Congress as evidenced in the statute under which he acted.

The order was right. It is affirmed.

RUSSELL, Circuit Judge, concurring.

I concur in the judgment of affirmance, and think that in most respects the decision ably demonstrates the reasons why this should be so. However, since I am in complete accord with the conclusions reached, and expressed in his opinion, by the very able and distinguished Circuit Judge Sibley, who sat in the District Court as United States Judge Designate, I can not accept such contrary views as are expressed in the present opinion.

HOLMES, Circuit Judge, dissenting.

I shall not undertake to point out with particularity any of the errors or imperfections that may be in the majority opinion. My view of this case can be stated more concisely by a discussion of the lower court's opinion, which failed to defer fully to the findings of the Commission. After stating that there seemed to be a fault in the Commission's finding of equivalency in value of the Coast Line securities to the debtor's property, the court below said: "I have no right to make new valuations, but these considerations further move me to

14. "The supremacy of law demands that there shall be opportunity to have some court decide whether an erroneous rule of law was applied and whether the proceeding in which facts were adjudicated was conducted regularly. To that extent, the person asserting a right, whatever its source, should be entitled to the independent judgment of a court on the ultimate question of constitutionality." Justice Brandeis concurring, St. Joseph Stock Yards v. U. S., 298 U. S. 38, at page 84, 56 S.Ct. 720, at page 740, 80 L.Ed. 1033.

disapprove the plan as not fair and equitable."

The disapproval of the plan for reasons not within the province of the court to consider was clearly erroneous; but the fundamental error that infects the judgment under review, and necessitates its reversal, is the holding that Section 77 does not permit a merger such as is proposed, and that this feature "ends this plan". In the first place, neither the statute nor the plan says anything about a forced merger. The statute expressly provides that a plan of reorganization may include a merger. This plan contemplates, first, the voluntary consent of the railroad not in reorganization and, second, the approval of the plan by the court having jurisdiction of every asset of the debtor. The latter's insolvency is such that the stockholders are not interested parties. The first-mortgage bondholders are to be fully paid in cash, and there can be no complaint in their behalf. The refunding bondholders are the parties primarily interested; but they are not (as the court below held) the equitable owners of the property. Under Section 77, as amended, they are merely creditors with a lien that is preserved in bankruptcy. The property has been dedicated to a public use, subject to well known rights of stockholders and creditors. It is now in the custody of the bankruptcy court to be protected and administered under said section.

Lienors do not become stockholders or succeed to the latter's rights merely because the debt secured by the lien so far exceeds the value of the property that nothing will be left for stockholders. The primary object of Section 77 is not the rehabilitation of a debtor that is hopelessly insolvent, but the protection of the priority rights of lienors and the continuation of the railroad as a going concern. Priority rights of lienors may involve a surrender of their liens in exchange for new securities of equal value. Under this section, it is for the Commission to prepare a plan that will insure against capitalization which is incompatible with the public interest. The judicial functions of the court are brigaded with the administrative powers of the Commission to determine congressional intent and to effectuate the legislative will. These powers or functions are not blended; they are exercised cooperatively but not jointly. The court has its limited duties to perform, as does the Commission; but each acts separately within its special sphere, and neither is permitted to usurp the prerogatives of the other.

The Commission's finding that the plan is compatible with the public interest is fully supported by substantial evidence. The court below did not hold that the plan violated the absolute priority rule, and neither does this court; but it is plain that the learned trial judge was largely influenced in his decision to reject the plan by the opinion that it contemplated a merger not *permitted* by law. This conviction colored his view of the entire case. He said: "I do not think Congress intended to force a merger undesired by the majority in amount of the affected parties by *permitting* a merger to be a part of a plan. This conclusion makes it unnecessary to determine whether the court's power in bankruptcy could be extended to force a merger consistently with the Fifth Amendment. It also ends this plan."

The judge also concluded to disapprove the plan, even if it were lawful, because (he said) it was testified under oath before him and seemed plain to him that it would be rejected almost unanimously by the refunding bondholders. This ruling was premature, and was not warranted on the supposition that he would not later confirm the plan. Judicial discretion must be exercised at the time prescribed for the exercise thereof, and in the light of the facts existing at the appropriate date. No judge can foretell what his decision will be on a record that is not complete and that is to be made up of facts concealed in the womb of time. Such a decision *in futuro* would be uncertain even if it could be known that the same judge would preside at a subsequent hearing; but when it is impossible to foretell not only what the facts will be but who will be the presiding judge, the prediction is rendered doubly doubtful. This uncertainty as to the main element is ex-

traordinary in the present case, because a member of the court of appeals was designated to hear it in the district court, and a district judge was designated to sit in the case on appeal to this court. When the same or an amended plan comes back from the Commission, a new judge may be presiding in the district court, and on appeal it may be heard before the court *en banc*. The circuit judge below said that ordinarily his conclusion would be premature but "the atmosphere" of the trial and the "feeling manifested" satisfied him absolutely that there would be no material change. In a matter of statutory procedure, where nice distinctions are drawn between the judicial functions of the court and the administrative powers of the Commission, it cannot be considered a waste of time to follow strictly the provision which provides that the plan, if approved, shall then be submitted by the Commission to the creditors of each class. There is no provision of law for the court or judge to submit the plan to the creditors or to give any consideration before the vote is taken to how the creditors will vote on it. The best rule for any court, trial or appellate, is to decide the issues presented to it and to decide nothing more than is necessary to dispose of the case. *Dictum* should be avoided and forecasts discountenanced.

Another misconception evidenced by the opinion of the court below was that the rights of these creditors were comparable to the rights of bondholders in a receivership proceeding. The statement is made that such bondholders had the right to a decree of foreclosure and a judicial sale of the railroad property, accompanied by the right to bid for the property if they wished. This statement is followed by the assertion that in equity the property belongs to the refunding bondholders who practically replace the stockholders as owners and naturally, on a reorganization, would receive the common stock *pro rata*. It is conceded that each of the bondholders took all of the rights of his vendor, and that the debtor owes the full amount of principal and interest due on each bond; but the bondholders are not entitled, as a matter of right, to a public sale of the property or to take over and run the railroad. They have the right to the fair value or equitable equivalent of the railroad's property, tangible and intangible, but the Commission is the sole judge of such values, and its findings are binding on the court if supported by substantial evidence. The statute provides that, if it shall be necessary to determine the value of any property for any purpose, the Commission shall determine such value and certify the same to the court in its report on the plan. 11 U. S.C.A. 205, sub. e.

Finally, when a railroad corporation files a petition for reorganization under said Section 77, it voluntarily submits all of its assets and liabilities to the jurisdiction of the bankruptcy court; but it remains a legal entity, and does not lose its corporate identity. Creditors do not become stockholders, but remain creditors, with their liens and priority rights preserved. There is no applicable constitutional prohibition against impairing the obligations of contracts. One of the very objects of the bankruptcy proceedings is to impair the obligation of contracts within the limits of the Fifth Amendment. The lower court refers to the original rights of bondholders to a receivership and a judicial sale, including the right to bid in the property if they wish; but, as we have noted, secured creditors in bankruptcy have no such rights, especially in railroad reorganizations where the property in custody of the court is affected with a public interest. In ordinary bankruptcy, the court may permit the trustee to abandon property that is mortgaged beyond its value, but Section 77 does not contemplate any such thing with reference to railroad property. In railroad reorganizations, creditors must be protected to the extent of the value of the property covered by their lien, and absolute priorities must be preserved; but beyond that the public interest is the principal thing to be considered; and, therefore, it is for the Commission, skilled in dealing with going railroads, to work out essentially business problems affecting them. The functions of the court, in approving or reject-

ing a plan, are purely judicial. The delegated power of the Commission in devising and proposing the plan is legislative, executive, and quasi-judicial. The greatest tribute that can be paid to the federal courts is that they do not seek to extend their jurisdiction by usurpation. Cf. Rose on Federal Jurisdiction (2nd Ed.), Section 16, p. 21.

In Palmer v. Massachusetts, 308 U.S. 79, at page 86, 60 S.Ct. 34, at page 37, 84 L. Ed. 93, the court said: "Until the amendment of March 3, 1933, railroads were outside the Bankruptcy Act. But the long history of federal railroad receiverships, with the conflicts they frequently engendered between the federal courts and the public, left an enduring conviction that a railroad was not like an ordinary insolvent estate. Also an insolvent railroad, it was realized, required the oversight of agencies specially charged with the public interest represented by the transportation system. Indeed, when, in the depth of the depression, legislation was deemed urgent to meet the grave crisis confronting the railroads, there was a strong sentiment in Congress to withdraw from the courts control over insolvent railroads and lodge it with the Interstate Commerce Commission. Congress stopped short of this remedy. But the whole scheme of § 77 leaves no doubt that Congress did not mean to grant to the district courts the same scope as to bankrupt roads that they may have in dealing with other bankrupt estates."

The court further said that about one-fourth of the railroad mileage of the country was in bankruptcy, which included lines in twenty-nine states, and that it had become "the settled social policy both of the states and the nation to entrust the type of public interest here in question to expert administrative agencies because of 'the notion', as Judge Learned Hand pointed out below, 'that a judge is not qualified for such duties.' "

See also R. F. C. v. Denver & R. G. W. R. Co., 328 U.S. 495, 66 S.Ct. 1282, 1384, 90 L.Ed. 1400, wherein the plan was approved although a majority of the general mortgage bondholders voted against it.