In re FLORIDA EAST COAST RY. CO.

No. 4827.

United States District Court
S. D. Florida, Jacksonville Division.

March 11, 1952.

See also, 81 F.Supp. 926.

Giles J. Patterson, of Jacksonville, Fla., and John R. Turney and Robert N. Lowry, of Washington, D. C., for St. Joe Paper Co.

Henry P. Adair and Clarence G. Ashby, of Jacksonville, Fla., and Donald Russell, of Spartanburg, S. C., for testamentary trustees of the Alfred I. duPont estate.

Oliver & Donnally and Willard P. Scott, of New York City, and J. Turner Butler, of Jacksonville, Fla., for S. A. Lynch and associated interests.

Miller Walton, of Miami, Fla. (Walton, Hubbard, Schroeder, Lantaff & Atkins, of Miami, Fla., of counsel), for W. G. Welbon and others.

Macfarlane, Ferguson, Allison & Kelly and George W. Ericksen, of Tampa, Fla., for F. K. Conn and others.

Clarence M. Mulholland, Toledo, Ohio, and Edward J. Hickey, Jr., of Washington, D. C., and Edwin C. Coffee, of Jacksonville, Fla., for Railway Labor Executives' Ass'n.

Smathers, Thompson, Maxwell & Dyer, of Miami, Fla., for W. R. Huggins and others.

Alexander & Green, Edward W. Bourne, Andrew Oliver, William A. Boylan, of New York City, Charles Cook Howell and Richard B. Gwathmey, of Wilmington, N. C., and Howell & Howell, of Jacksonville, Fla., for Atlantic Coast Line R. Co.

Henry L. Walker, Charles Clark and Sidney S. Alderman, of Washington D. C., and Cyril C. Copp, of Jacksonville, Fla., for Southern Railway System and affiliated lines.

Harold J. Gallagher and Walter H. Brown, Jr., of New York City, James B. McDonough, Jr., of Norfolk, Va., and Guy W. Botts, of Jacksonville, Fla., for Seaboard Air Line R. Co.

Jerome C. Hofmayer, of Miami, Fla., for Greater Miami Traffic Ass'n and Miami Chamber of Commerce.

Lewis W. Petteway and D. Fred McMullen, of Tallahassee, Fla., for Florida Railroad and Public Utilities Commission.

John B. L'Engle, of Jacksonville, Fla., for debtor.

Russell L. Frink, of Jacksonville, Fla., for debtor's trustees.

Davis, Polk, Wardwell, Sunderland & Kiendl and Edgar G. Crossmen, of New York City, and Stockton, Ulmer & Murchison, of Jacksonville, Fla., for first and refunding mortgage bondholders' committee.

Jackson, Nash, Brophy, Barringer & Brooks and Paul B. Barringer, Jr., of New York City, and Osborne, Copp & Markham and H. P. Osborne, of Jacksonville, Fla., for first mortgage trustees.

Appleton, Rice & Perrin, Clifton S. Thomson, Robert M. McCulloch and G. R. Gerhard, of New York City, and Bedell & Bedell, of Jacksonville, Fla., for first and refunding mortgage trustees.

STRUM, Circuit Judge.[1]

Florida East Coast Railway Company operated under an equity receivership in this Court from August 31, 1931, until January 25, 1941, when a reorganization proceeding was instituted under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, as amended.

Four plans of reorganization have been proposed by the Interstate Commerce Commission. The first and third were rejected by this Court. The second was in effect withdrawn by the Commission. The matter is now before the Court for consideration of the fourth amended plan, approved by the Commission on July 12, 1951, certified to the Court on October 25, 1951, and taken up by this Court for consideration on February 4, 1952.

As of January 25, 1941, when the petition for reorganization was filed, the debtor railway's capitalization, plus receivers' obligations, was:

Capital stock .............. $37,500,000.00
First Mortgage 4½% bonds,
  due January 1, 1959...... $12,000,000.00
First and Refunding Mortgage 5% bonds, due September 1, 1974.......... $45,000,000.00
Equipment Trust Certificates, Series "H" 4½%.. $    180,000.00
                                   ──────────────
                                   $94,680,000.00
Receivers' Equipment Trust Certificates, Series "I" 3% $ 1,116,000.00
                                   ──────────────
       Total ........... $95,796,000.00

Since January 25, 1941, the reorganization trustees have purchased and now own $3,811,000 of the $12,000,000 First Mortgage 4½% bonds, leaving actually outstanding of that issue $8,189,000. They have also retired Equipment Trust Certificates, Series "H," "I," and "J." Additional Equipment Trust Certificates, Series "K," have been issued, however, and three new Conditional Sales Agreements for the purchase of equipment have been

executed, so that as of December 31, 1950, the capitalization and secured obligations of the debtor were:

Capital Stock ............ $37,500,000.00
First Mortgage 4½% bonds, due January 1, 1959
  (originally $12,000,000.00) $ 8,189,000.00
First and Refunding Mortgage 5% bonds, due September 1, 1974.... $45,000,000.00
Equipment Trust Certificates, Series "K"
  (originally $2,060,000.00) $ 1,648,000.00
Conditional Sales Agreement, dated March 15, 1945
  (originally $2,622,531.00) $    886,269.27
Conditional Sales Agreement, dated March 15, 1946
  (originally $1,692,637.77) $    444,533.00
Conditional Sales Agreement, dated July 15, 1947
  (originally $3,842,182.00) $ 2,214,440.00
                                   ──────────────
       Total ........... $95,882,242.27

All sums, principal and interest, due on the 4½% First Mortgage, as well as on all equipment obligations, have been paid in full when due. The debtor's financial difficulties stem primarily from the requirements of its 5% First and Refunding bonds, which have been in default since September 1, 1931. As of September 1, 1951, defaulted interest thereon aggregated $37,125,000, seven coupons,[2] aggregating $7,875,000, having been paid from time to time.

These bonds were issued in 1925, primarily to pay for double tracking the railway from Jacksonville to Miami in an effort to meet the extraordinary transportation requirements of the Florida "boom" of the middle 1920's, during which freight piled up in Jacksonville until the railroad storage tracks overflowed and an embargo upon further shipments became necessary. When the "boom" collapsed, the debtor railway—along with many other businesses

1. Sitting as District Judge, pro hac vice.

2. Coupons maturing September 1, 1931, March 1 and September 1, 1932, March 1 and September 1, 1933, and March 1 and September 1, 1934. The oldest unpaid coupon was due March 1, 1935.

—soon found that it had greatly overexpanded and could not meet its fixed charges. This produced the 1931 equity receivership. The nationwide economic "depression" of 1929–1937 also greatly reduced the debtor's earnings.

The first plan of reorganization, certified to the Court by the Interstate Commerce Commission on August 10, 1942 (252 I.C.C. 423, 731) was a simple, normal plan of internal reorganization which held the existing capital stock and unsecured indebtedness to be without value, and recognized the 5% bondholders as the equitable owners of the property, subject to the first mortgage and equipment obligations. The property was valued at $37,000,000, to be capitalized as follows:

| | |
|---|---|
| Equipment Notes ......... | $ 1,992,000.00 |
| First Mortgage Series "A" bonds, to be issued to holders of existing 4½% First Mortgage bonds.... | $12,000,000.00 |
| General Mortgage Series "A" bonds, to be issued to holders of existing 5% First and Refunding bonds ................. | $ 4,500,000.00 |
| Common Stock (no par) 450,000 shares, to be issued to holders of existing 5% First and Refunding bonds ............. | $18,508,000.00 |
| Total Capitalization... | $37,000,000.00, |

to which could be added, if necessary, not exceeding $6,000,000 in additional first mortgage bonds for capital expenditures. Maximum permissible capitalization under the first plan was therefore $43,000,000.

This plan provided that the First Mortgage 4½% bondholders would receive new First Mortgage bonds equal in amount and seniority to their former holdings, while the First and Refunding 5% bondholders would receive, for each $1,000 bond $100 of new General Mortgage bonds (junior to the First Mortgage bonds) and 10 shares of no par value stock. Existing interests in the property would thus be equitably preserved in the then owners by a ratable distribution to them of the new securities, the face value of their interest being scaled down to conform to the then actual value of their equity in the property.

This plan was rejected by the Court, October 19, 1943, not because of any objection inherent in the plan itself, but because a sum of approximately $17,000,000 in cash or its equivalent had accumulated in the hands of the reorganization trustees while the Commission had the matter under consideration from January 25, 1941, to August 10, 1942. This sum was unallocated by the plan. Being of the opinion that this sum should not be left as a floating surplus, but should be specifically allocated, the Court rejected this plan for that reason alone and returned the matter to the Commission for further consideration, anticipating that substantially the same plan would be resubmitted with these funds appropriately allocated. In re Florida East Coast Ry. Co., D.C., 52 F.Supp. 420.

On November 8, 1944, a petition was filed by a group of 5% bondholders, referred to as the Lynch interests, joined in by the Atlantic Coast Line Railroad Company, proposing a new plan of reorganization whereby Atlantic Coast Line would secure control of Florida East Coast by a forced sale to A.C.L. of 60% of the new common stock of the reorganized company. This proposal was unanimously rejected by the Commission, for the reason, amongst others, that the guaranties and cash expenditures to be made by Atlantic Coast Line would result in an unwise increase in its fixed charges.

Instead, on January 8, 1945 (266 I.C.C. 151–193), the Commission unanimously approved a second plan proposing a simple, workable internal reorganization along the general lines of the first, which recognized and continued the 5% bondholders as the equitable owners of the property, no drastic change in ownership being suggested, although it was then known to the Commission that the duPont interests, acting through its affiliate St. Joe Paper Company, owned more than 50% of the 5% bonds. This plan proposed payment in full of the $12,000,000 first mortgage out of surplus cash on hand, as suggested by the Court in its opinion rejecting the first plan, 52 F. Supp. 420, also setting aside $8,700,000 for

830

cash requirements upon reorganization, and for betterments and improvements. Valuation of the property was increased from $37,000,000 to $40,500,000, to be capitalized as follows:

New First Mortgage 75-year
   Income bonds . . . . . . . . . . $20,250,000.00
Common   Stock   202,500
   shares (no par value). . . . $20,250,000.00

These securities were to be distributed, together with the remaining cash on hand, pro rata to the First and Refunding Mortgage bondholders. In addition to the cash, each First and Refunding Mortgage bondholder would receive for each $1,000 bond, $450 principal amount of new First Mortgage Income bonds and 4½ shares of stock. Capital stock theretofore outstanding, as well as unsecured claims, were again found to be without value. A five-year voting trust was set up as to stock to be issued to St. Joe Paper Company in order to ensure what the Commission thought would be desirable protection for minority stockholders in order to safeguard them from any abuse by the majority.

Thus it appears that at least as late as January 8, 1945, the Commission did not favor Atlantic Coast Line control, but apparently regarded an internal reorganization, with a voting trust imposed on the duPont majority interest, to be compatible with the public interest and a feasible plan for the future operation of F.E.C.

For the reasons hereafter stated, this second proposed plan of internal reorganization, though approved by the Commission, was never finally certified by the Commission to this Court so that the Court could consider it on its merits. Instead, it was superseded by a third and fundamentally different plan, usually called the Atlantic Coast Line plan, which for the first time proposed that control be taken from the present owners and vested in A.C.L. This plan came about as hereafter stated.

Petitions for modification were filed to the second plan, pursuant to which the

Commission, on July 20, 1945, re-opened the whole matter for the taking of further evidence and for the proposal of other plans by the parties in interest. Until it unsuccessfully petitioned for control on November 8, 1944, Atlantic Coast Line was a stranger to these proceedings, and until October 18, 1945, it was neither a stockholder nor creditor of Florida East Coast and had no proprietary interest of any nature therein. There was no affiliation nor "interlocking" of interest or control between the two railways. On October 18, 1945, however, Atlantic Coast Line purchased unsecured claims against the Florida East Coast aggregating $1,900,000, which claims the Commission had twice previously held to be without value because it was then thought there was no unencumbered property out of which to satisfy the same.[3] Atlantic Coast Line paid $5,000 for these claims, and agreed with the former owners thereof to pay them an additional 50% of whatever might be realized thereon, less expenses.

As such unsecured creditor, Atlantic Coast Line on November 6, 1945, submitted to the Commission a plan which proposed a "merger" of Florida East Coast with Atlantic Coast Line. Under this plan ownership and control of Florida East Coast would have passed to Atlantic Coast Line, which would have thereafter operated the road, and Florida East Coast as an independent entity, would cease to exist. This plan valued the property at $40,500,000, so capitalized that secured F.E.C. creditors would receive about 9% of the principal of their claims in new cash to be supplied by A.C.L. ($4,125,000) plus any "free cash" not needed for other purposes; the remainder in A.C.L. securities, the details of which will be stated later. Existing F.E.C. creditors would thus become security holders in A.C.L., and no longer creditors of F.E.C. The existing $12,000,000 F.E.C. first mortgage would be paid off in cash from accumulated earnings of F.E.C.

By its order of April 8, 1947, the Commission approved the Atlantic Coast Line

---

3. These claims later became of substantial value, however, when it was held by this Court that there were unencumbered assets, later valued by the Commission at $1,177,356, available to pay these and other unsecured claims.

(third) plan, with some modifications, and by a 6 to 5 vote certified the same to this Court for consideration on March 25, 1948, 267 I.C.C. 295; idem page 729.[4]

This plan came on for consideration before this Court on January 10, 1949, objections thereto having been filed by substantially all the 5% bondholders, including the Lynch interests who originally proposed Coast Line control.[5] On January 22, 1949, the Court rejected this plan as unjust and inequitable, and referred the matter back to the Commission for further efforts to make a proper plan. 81 F.Supp. 926. The order rejecting this plan was affirmed on appeal, January 17, 1950, Atlantic Coast Line R. Co. v. St. Joe Paper Co., 5 Cir., 179 F.2d 538, one judge dissenting. Certiorari was denied by the Supreme Court, April 3, 1950, 339 U.S. 929, 70 S.Ct. 627, 94 L.Ed. 1349.

Of this third or A.C.L. plan, this Court, speaking through Circuit Judge Sibley, then sitting here as District Judge pro hac vice, said:

"The gist of the matter is that, because the majority of the Commissioners think it not compatible with the public interest for St. Joe Paper Company to own a controlling amount of voting stock in the reorganized East Coast railroad if reorganized in the simple and natural manner several times certified by the Commission unanimously by giving all the refunding bondholders a pro rata share of its common stock, all of them must surrender the investment they have chosen and lawfully own in the East Coast property and must take in return an investment which most of them do not desire to own and do not think is an equivalent. * * *

"I conclude also that the plan is not fair and equitable and does not afford due recognition to the rights of the refunding bondholders. These bondholders originally had a general mortgage covering railroad property, franchise, and income, with a right to a receivership on default to collect the income, and to a decree of foreclosure and a judicial sale; and the right to bid for and buy the property if they wished and made the highest and best bid. * * This railroad property is in equity the property of the refunding bondholders who replace practically the stockholders as owners. On a reorganization they would naturally receive the common stock pro rata. All the plans approved by the Commission save the present one so provided. * * * But the Commission, within its province, though by a bare majority, has held that the public interest prevents St. Joe Paper Company from holding a majority of common stock, and therefore proposes that no bondholder can have the common stock he desires and expected, but all must sell their equitable rights in this property, and must take in exchange that which is not money and which they do not desire to have. This seems to me to be unfair, inequitable, and not a due recognition of their rights." In re Florida East Coast Ry. Co., D.C., 81 F.Supp. 926, 929.

The Court of Appeals, speaking through Chief Judge Hutcheson, held that the statute authorized the Commission to require a forced merger in connection with a Section 77 reorganization, but affirmed Judge Sibley's judgment that the merger proposed by the third plan was intrinsically unjust and inequitable. The Court of Appeals, one judge dissenting, said:

4. Five Commissioners vigorously dissented, advocating a simple internal reorganization along the general lines of the first and second plans. The Commission's trial examiner, who had made a long and painstaking investigation of the facts, also recommended an internal reorganization.

5. Objections were also filed by Railway Labor Executives' Association representing the organized employees of F.E.C., Southern Railway Company, Seaboard Air Line Railway Company, and New York

Trust Company as trustee under Equipment Trust "D." The only creditor assenting to the plan was a Deposit Committee then representing $572,400 (1.3%) out of $45,000,000 of the First and Refunding bonds, the members of which Committee are on friendly business terms with A.C.L. This Committee now represents only $437,900 of 5% bonds,—slightly less than 1%, although at one time it represented about $30,000,000. Its representation has been steadily declining since about 1944.

"The case we have here is that of one railroad company coveting, and pressing to possess, a competing debtor railroad company, against the wishes of 98 percent of the equitable owners of the debtor and over their violent objections, that consummation of the plan will result in depriving them of their property without just compensation. * * *

"The Congress brigaded commission and court in railroad reorganization proceedings, not because the Congress has determined to paramount the public interest to the point of taking the property of the debtor and of its security holders without just compensation and by administrative fiat, but for quite contrary reasons. By a plan which combines the functions and efforts of commission and court, the Congress went about to secure, not the destruction or subordination of the private interests of security holders of the debtor to the interest of the public in its future control, but the protection of private · and public interest without sacrifice of each to the other. * * * It did this by confiding final approval to the courts, and requiring the court to be satisfied, before approving it, that the plan 'is fair and equitable and affords due recognition to the rights of each class of creditors and stockholders'. * * *

"Reviewing this record, therefore, in the light of these principles, taking note of its tremendous overemphasis on and the preoccupation of the commission with the struggle on the one hand of the St. Joe Paper Co., and on the other, of Coast Line for control of the debtor, with its subordination of the primary question of the legal and equitable rights of the bondholders as such, we are left in no doubt that the trial judge was right, for these reasons and for the other reasons that he gave, in disapproving the plan as not fair and equitable and not affording due recognition to the rights of the bondholders. Indeed, we are of the opinion that a contrary holding could not have been sustained and that the order declining to approve the plan and referring the proceeding back to the commission must be affirmed. * *" Atlantic Coast Line R. Co. v. St. Joe Paper Co., 5 Cir., 179 F.2d 538, 542.

Notwithstanding the clear language of these opinions rejecting the third plan, and over the almost unanimous objections of the 5% bondholders, the employees, shippers, and other parties, the Commission approved July 12, 1951, by a 7 to 3 vote,[6] and certified to the Court on October 25, 1951, a fourth plan which is fundamentally the same as the third, but with an apparent $6,000,000 increase in valuation which will be discussed later.

Absorption of Florida East Coast by Atlantic Coast Line, and elimination of the former as an independent carrier, is the dominant characteristic of the fourth plan, as it was also of the third. The Commission appears to have begun its labors upon the postulate that F.E.C. must be merged with A.C.L. regardless of objections, after which all other matters were shaped to conform to that objective.

Under the fourth plan the $12,000,000 First Mortgage is to be paid in full. As in the rejected third plan, the 5% bondholders of Florida East Coast would receive in cash about 9% of the principal of their claims. For the remaining 91%, these bondholders, over their objection, would be forced to give up their present securities in F.E.C., which they lawfully own and desire to retain, and would become involuntary security holders in Atlantic Coast Line, in the management of which they would have no voice, and in which they do not wish to invest their capital. Thus the fourth plan retains the basic inequities for which the third plan was rejected.

Under the fourth plan, the property is valued at $46,500,000, instead of $40,500,-000 under the third plan, with a corresponding increase in new securities to be received by present F.E.C. security holders. This apparent increase of $6,000,000 in valuation, however, will not improve the

6. The three dissenting Commissioners again advocated a plan of internal reorganization which recognizes and continues the 5% bondholders as owners of the property.

security holders' position over the rejected third plan, for the reasons hereafter stated.

This fourth plan is vigorously opposed by more than 99% of the First and Refunding bondholders. It is favored only by Atlantic Coast Line, which has no property interest in F.E.C. other than its recently acquired unsecured claim constituting about 2% of the total F.E.C. indebtedness, and by less than 1% of the First and Refunding bondholders, represented by a Committee enjoying friendly business relations with A.C.L.

The identical similarity of the third and fourth plans as to the "merger" of F.E.C. into A.C.L. has been pointed out. The close fiscal similarity of the two plans is readily apparent from the following comparisons:

### Capitalization.

| | 3rd Plan | 4th Plan |
|---|---|---|
| Cash, new money supplied by ACL........ | $ 4,125,000 | $ 4,000,000 |
| ACL Divisional First Mortgage 3½% fixed interest bonds, secured by first mortgage on former F.E.C. property............. | $13,500,000 | $........ |
| ACL Divisional First Mortgage 3¾% bonds, secured by first mortgage on former F.E.C. property................... | $........ | $14,000,000 |
| ACL Divisional Income 4½% bonds, secured by junior mortgage on former F.E.C. property ..................... | $ 7,875,000 | $13,500,000 |
| ACL 4% Preferred Stock (par value)..... | $ 9,000,000 | $ 9,000,000 |
| ACL Common Stock ................... | $ 6,000,000 | $ 6,000,000 |
| | $40,500,000 | $46,500,000 |
| Equipment obligations ................. | $ 2,829,177 | $ 5,314,086 |
| Total Capitalization ............. | $43,329,177 | $51,814,086. |

### Distribution.

The amount of cash and A.C.L. securities, at their par value, to be awarded First and Refunding Mortgage bondholders as payment in full for each $1,000.00 bond, principal and accrued interest, is:

| | 3rd Plan | 4th Plan |
|---|---|---|
| Cash ..................................... | $ 91.67 [7] | $ 84.69 |
| ACL Divisional fixed interest First Mortgage bonds ................................ | $300.00 | $ 300.00 |
| ACL Divisional Junior Income bonds.......... | $175.00 | $ 300.00 |
| ACL Preferred Stock......................... | $200.00 | $ 200.00 |
| ACL Common Stock.......................... | $133.33 | $ 133.33 |
| Total Par Value.................... | $900.00 | $1,018.02 |

7. The $91.67 cash per $1,000 bond under the third plan is the $4,125,000 new money to be supplied by Atlantic Coast Line divided amongst the 45,000 holders of $1,000 First and Refunding Mortgage 5% bonds. The $84.69 minimum cash under the fourth plan is the cash equivalent, similarly divided, of the $3,811,000 First Mortgage bonds purchased by the reorganization trustees with funds which would otherwise have been available for payment of 5% bond interest. The remaining $189,000 of the $4,000,000 to be contributed by A.C.L. is to be applied in payment of court imposed liens, hereafter discussed in the opinion. Under the

Of course the market values of these securities will be far less than their par value.

■ This Court fully recognizes the doctrine that in railroad reorganizations under Section 77, Congress "placed leadership in the Commission, subject to a degree of participation by the Court." Thus, valuation of the property, the amount and character of capitalization, and the determination of whether or not the plan is compatible with the public interest, are confided to the Commission. Its determination of these matters is conclusive when reached "with material evidence to support the conclusion and in accordance with legal standards.[8]" The Court is not authorized to independently value the property, nor to formulate a plan of its own, nor to review the Commission for mere error. But the determination by the Commission of the matters above mentioned must be in accordance with the mandates of the statute. Whether or not, in valuing the property and in determining the public interest, the Commission has acted upon substantial evidence and in accordance with statutory directions is open to judicial review. Ecker v. Western Pac. R. Corp., 318 U.S. 448, 477, 63 S.Ct. 692, 707, 87 L.Ed. 892, 934.

■ It is also the settled law of this case that a "forced merger," that is, in the language of Chief Judge Hutcheson in 179 F.2d at page 544: "a merger over the objection of the debtor and all its creditors, might be lawfully certified to the court and lawfully approved and confirmed by it." But the plan of merger must be fair and equitable, must afford due recognition to the rights of each class of creditors and stockholders, and must conform to the law of the land regarding the participation of the various classes of creditors and stockholders. Such is the mandate of the statute. Section 77, sub. e, 11 U.S.C.A. 205, sub. e. The duty and responsibility of determining whether or not the plan conforms to these statutory requirements is committed to the Courts. This is not a mere perfunctory duty. It places upon the Courts a most exacting responsibility, in the discharge of which they exercise an informed but independent judgment.[9]

■ After a careful analysis of the Commission's fifth and sixth supplemental reports, and after hearing the evidence and arguments before this Court, consuming eight days, the Court is clearly of the opinion that the proposed fourth plan is neither fair nor equitable, nor does it afford due recognition to the rights of the 5% bondholders. Under it, the 5% bondholders do not receive in real value the just equivalent of what they now have, and, as in the third plan, their rights are inequitably subordinated to the supposed public interest.

One of the outstanding infirmities of the fourth plan, as it was also of the third, is its adverse impact upon the rights of the minority 5% bondholders. As was pointed out by Judge Hutcheson in 179 F.2d at page 543, with respect to the third plan, this is the result of the "tremendous over-emphasis on and the preoccupation of, the commission with, the struggle on the one hand of the St. Joe Paper Co., (the duPont interests) and on the other, of Coast Line for control of the debtor, with its subordination of the primary question of the legal and equitable rights of the bondholders as such * * *." This is one of the principal reasons given by the Court of Appeals for rejecting the third plan. The same observa-

fourth plan there will be additional cash available for distribution to the 5% bondholders, but relatively small in amount.

8. Ecker v. Western Pac. R. Corp., 318 U. S. 448, 63 S.Ct. 692, 87 L.Ed. 892; R. F.C. v. Denver & R. G. W. R. Co., 328 U.S. 495, 66 S.Ct. 1282, 90 L.Ed. 1400; Group of Institutional Investors v. Chicago M., St. P. & P. Ry. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959; Palmer v. Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93.

9. Atlantic Coast Line R. Co. v. St. Joe Paper Co., 5 Cir., 179 F.2d 538; Benton v. Callaway, 5 Cir., 165 F.2d 877; Insurance Group Committee v. Denver & R. G. W. R. Co., 329 U.S. 607, 67 S.Ct. 583, 91 L.Ed. 547; Comstock v. Group of Institutional Investor's etc., 8 Cir., 163 F.2d 350, affirmed 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 1911; Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982.

tion is equally true of the fourth plan, now before the Court.

From the Commission's fifth and sixth supplemental reports relating to the fourth plan, it convincingly appears that the Commission is still preoccupied with, and completely immersed in, this struggle for control between A.C.L. and the duPont interests, in which it has favored the Coast Line with adamant consistency since 1947, and to the distinct prejudice of the $20,000,000 of minority 5% bondholders, who, in order to effect a merger with the Coast Line, are required to relinquish what they now lawfully own and desire to keep, and to become involuntary security holders in Atlantic Coast Line, a wholly unrelated corporation. This result is unfair to all the 5% bondholders, but particularly to the minority groups, who are innocent bystanders caught between the upper and nether millstone, and who now, like ancient Odysseus, drift helplessly between Scylla and Charybdis, hoping to be rescued.

What is proposed by the Commission in the fourth plan, as in the third, is not really a "merger." It is in fact an enforced, non-competitive sale of F.E.C. to A.C.L., a wholly unrelated corporation, over the objections of 99% of the present bondholders whose property interests are at stake, and who do not wish to sell, and over the active protest of F.E.C. employees whose jobs and seniority rights are also at stake, and who do not wish to be forcibly transferred to Atlantic Coast Line. The plan virtually gives A.C.L. the power of eminent domain over F.E.C., with authority to pay, not in cash, but 90% in Coast Line securities of debatable value.

Technically, these 5% bondholders are not now the owners of the legal title to the property, but are creditors holding a lien. In equity and good conscience, however, this railroad belongs to the 5% bondholders, subject only to equipment obligations, and to the lien of the first mortgage, funds to pay off the latter being presently available. The 5% bondholders own the equity in the property, after satisfying these obligations. To deprive them of the equitable ownership of this property in which they have invested their money and which they desire to retain, and over their active objections to require them to accept in lieu thereof unwanted securities in an entirely different and unrelated railroad corporation, in the management of which they would have no voice, is intrinsically unfair and inequitable. This is so even though the new securities in the other railroad may have an ostensible value equal to that of the present securities of the debtor railroad. If persons are to be thus deprived, in invitum, of their lawfully held property and forced over their objection to accept in lieu thereof property of debatable value which they do not want, while the property they now lawfully own and wish to retain is awarded to a stranger who wishes to acquire it, the exercise of such a drastic and far-reaching power—approaching absolutism in Government even in the case of a public utility—should rest upon considerations more compelling than those offered by the Commission in support of its fourth plan.

Atlantic Coast Line had the same opportunity to buy up these 5% bonds as did the duPonts and others, and thus become the equitable owners of this property, but they did not do so. They stood by during the lean years when the road was struggling to get back on its feet after the nationwide depression, until the road's cash position was greatly improved, with some $20,000,000 in cash and supplies on hand, until more than $27,000,000 has now been spent from earnings in improving and rehabilitating the road, until the intervening rights of the present 5% bondholders had arisen, until revenues are clearly on the increase and the road in a prosperous condition, and now, with the sanction of the Commission, propose to take over F.E.C. and add it to the Coast Line's already far-flung system. This the fourth plan permits them to do, on what appears to be a very low valuation, payable, not in cash, but 90% in Coast Line securities of fluctuating and debatable value. This Court is of the opinion that such a procedure is intrinsically unfair and inequitable.

Pretermitting, however, the considerations above discussed, and taking the fourth plan at its face value, it is inherently unfair and inequitable to the present security

holders, for the following reasons, amongst others:

1. In valuing the property the commission did not follow the mandate of Section 77, sub. e, that it "give due consideration to the earning power of the property, past, present, and prospective, * * *."

The fourth plan values the property at $46,500,000, which was obviously reached by a capitalization at 5% of the sum of $2,300,000, found by the Commission to be the amount of adjusted net income reasonably available for Federal income tax and corporate fixed charges, in a future normal year. That this was the Commission's method of valuation is made crystal clear by the fact that 20 times $2,300,000 (a 5% capitalization) is $46,000,000 to which was admittedly added $500,000 representing a capitalization of one-half the anticipated annual savings to be effected by the proposed merger, which will be discussed later. This figure as to net earnings is therefore the foundation of the Commission's plan of capitalization. If it is inaccurate, the whole structure topples.

The Commission finds that F.E.C. adjusted net income available for fixed charges and federal income taxes, that is, what might be called "net" income before federal taxes, has been:

1946 — $3,315,197
1947 — $2,063,897
1948 — $2,492,191
1949 — $2,020,970
1950 — $2,711,185

Average for the five-year period, $2,520,688.

In arriving at these figures, the Commission deducted, each year, from annual gross income the sum of $518,856,[10] for rail normalization, which is roughly the equivalent of rail depreciation, being the average annual cost of replacing the rails as they wear out. This figure for rail normalization is obviously too high. The Commis-

sion itself says it "may be excessive." The Court readily agrees that it is. This figure is, to the dollar, the figure supplied by the A.C.L. witness, Ormond, arrived at by an exceedingly intricate and complicated computation based upon the experience of A.C. L. in its own operations, which apparently left the Commission unconvinced of its applicability to Florida East Coast. Yet the Commission used that figure in the most vital calculation entering into its plan of capitalization, namely a determination of net available income, which it capitalized at 5% in order to determine the valuation of the property.

■ In the testimony before this Court, two credible witnesses fixed this amount at $221,638 per year. The latter sum, $221,-638, is arrived at by taking the figure of $6,649,145.76, which was the *actual* sum expended by F.E.C. in its rail rehabilitation program just completed, and dividing that sum by 30 years—the normal service life of the type of rail in question. This produces a quotient of $221,638 as the average cost per annum to be deducted from gross income. Nothing could be simpler nor fairer. Yet the Commission, employing a highly theoretical and technical formula used by another railroad, and apparently rejecting all the other credible evidence on the subject relating to the F.E.C. itself, has deducted from F.E.C. income $518,856—more than double the above figures based upon actual cost—not theory. This, of course, drastically reduced net available income, and that in turn reduces capitalization, because the Commission has capitalized net available income at 5% in order to determine the value of the property.

If F.E.C. income is reduced annually for rail normalization by $221,638, which is based upon actual experience, rather than $518,856, borrowed by the Commission from A.C.L., the net available income of F.E.C. would be:[11]

10. The figure used by the Commission for the year 1946 was actually $459,537.

11. Arrived at by taking the excess of the A.C.L. witness figure over the actual experience figure of F.E.C. ($297,218) and adding it to the Commission's income figures given in the last preceding tabulation.

1946 — $3,612,415
1947 — $2,361,115
1948 — $2,789,409
1949 — $2,318,188
1950 — $3,008,403

Average for the five-year period $2,817,-906, instead of $2,520,688, as found by the Commission, and reduced by it to $2,300,000 for purposes of capitalization. If $2,817,-906 is capitalized at 5%, it produces a capital value of $56,358,120, instead of $46,-500,000 adopted by the Commission.

■ Over the last 10 years, which included some "war years," the debtor's average annual adjusted net earnings have been approximately $5,600,000; over the past 15 years, including both "war" and "lean" years, approximately $4,000,000. The figure of $2,300,000 finally adopted by the Commission as "normal" future annual earnings is less than half actual average earnings over the past 10 years, when properly adjusted, approximately three-fifths of the average earnings over the past 15 years, and about three-fourths the average for the past five years.

From the testimony before it, the Court finds that in fixing the net available income at $2,300,000 the Commission did not follow the evidence, did not give *due* consideration to the earning power of F.E.C., and therefore did not obey the statutory mandate. Its own doubts were candidly admitted by the finding that its deduction figure "may be excessive."

In view of the substantial and undisputed evidence of the continuous growth in population of the territory served by F.E.C., the new industries located on that line within the past few years, one of which alone will produce an annual revenue to F.E.C. of $700,000, the 50% Dieselization of service with resulting operating economy, and particularly in view of the fact that freight revenue has more than doubled during the past 10 years, and taking into account the road's *actual* net adjusted earnings in the past, averaging $2,817,906 during the 5 years 1946–50, instead of $2,300,000 theoretically adopted by the Commission, the Court finds that a plan based upon a capitalization of $2,300,000 as normal available income is entirely inconsistent with the actual proven experience of the road, and unsupported by substantial evidence.

This figure of $2,300,000 for annual available net income does not, and could not, take into account the net increase in earnings for 1951 due to rate increases, aggregating about $400,000. If capitalized at 5%, this revenue would produce an additional value of $8,000,000. The Florida Public Service Commission has recently allowed an additional intra-state increase of 10%, which is expected to produce an additional $300,000 increase in net revenue, and an application is now pending for an additional increase of 9% in inter-state rates.

■ Moreover, the Commission valued this property in 1941 at $37,000,000, since which time there have been added thereto improvements and betterments aggregating approximately $27,000,000, the depreciated value of which is approximately $16,000,-000. Add the latter sum to the 1941 Commission valuation of $37,000,000 and the result is $53,000,000. By capitalizing at 5% an annual adjusted net income of $2,300,-000, as above explained, the Commission comes out with a present value of $46,000,-000 (exclusive of the $500,000 for anticipated savings from unification). This is a recognized and permissible method of determining value, indeed the "primary" method when an internal reorganization is under consideration. But somewhere in this process $7,000,000 of actual value has vanished, the consequences of which are visited upon the 5% bondholders by this plan. That is because the Commission's estimated annual earnings of $2,300,000 is too low.

Although capitalization of the earning power is the primary method of determining value, it is nevertheless significant that, according to the Commission's own findings, the actual cost value of this property (exclusive of land and rights) has increased from $72,231,357 in 1938 to $78,713,104 in 1948—an increase in value of $6,481,747.

2. Under the fourth plan, the Commission uses a capitalization formula less favorable to the 5% bondholders than under the rejected third plan, or under any prior plan. The formula consists of two factors,

(a) an estimate of normal annual earnings, and (b) a multiplier to convert earnings into value.

In its first plan (1942) the Commission estimated that the debtor's normal earnings would be $1,268,000, and used a multiplier of 29 to produce a capitalization of $37,-000,000 (actually $36,772,000), thus capitalizing earnings at the rate of 3½%.

In the second (1945) and third (1947) plans, the estimate of earnings was $1,500,-000, to which the Commission applied a multiplier of 27, to produce a capitalization of $40,500,000, thus capitalizing earnings at the rate of 3¾%.

In the fourth plan, the earnings are estimated at $2,300,000, but the multiplier used is 20, to produce a value of only $46,000,000 (exclusive of the $500,000 added for anticipated savings as already explained), thus capitalizing earnings at the rate of 5%. So, while the estimated earnings in the fourth plan are increased by $800,000 over the third, this increase is offset by reducing the multiplier from 27 to 20, thus depressing the resulting valuation.

Otherwise stated, when the first plan was formulated, the earning power of money was assumed by the Commission to be 3½%; under the second and third plans 3¾%, but under the fourth plan it has jumped to 5%. This is much less favorable to the bondholders because, as the rate of yield increases, the amount of capital necessary to produce a given sum diminishes. Since in this case "capital" is synonymous with "value," it becomes readily apparent that by using the 5% capitalization in the fourth plan, a lower valuation of the property is produced than if a lower rate of yield had been used, as in the third and prior plans. For example, capitalized at 3¾% as in the third plan, it requires a capital of $2,666.67 to produce $100 of income, whereas if a capitalization of 5% is used, as in the fourth plan, a capital of only $2,000 is required to produce $100. If the term "capital" is translated into "value," as it should be here, it is readily apparent that to raise the rate of yield from 3¾% to 5% has the concomitant effect of reducing the capitalized value. As capitalization of earnings is the basis of valuation under the fourth plan, it is readily apparent that the bondholders do not fare as well under the fourth plan with a 5% rate of capitalization, as under the third with a 3¾% rate. If the multiplier 27, used by the Commission in the second and third plans, were used in this one, the present value of the property would become $62,100,000, exclusive of capitalized savings. If the multiplier 29, used by the Commission in the first plan, were again used here, the resulting valuation would be $66,700,000, even on a basis of average annual earnings of $2,-300,000, which is too low.[12]

3. To notice next a relatively small item: the third plan required A.C.L. to pay the 5% bondholders $4,125,000 in new cash. The fourth plan requires only $4,000,000.

■ 4. The $4,000,000 required by the fourth plan, when analyzed, is more illusive than real. The plan requires that out of cash presently on hand, arising from F.E.C. earnings, there be segregated and turned over to A.C.L. $3,000,000 for construction of new stations and $1,000,000 for working capital. (Only $500,000 was required for working capital under the third plan). Thus, A.C.L. puts in $4,000,000 in cash, and simultaneously receives from the estate of the debtor $4,000,000 in cash. This is a mere exchange of dollars, which benefits

12. These computations are based upon the assumption that the estimates of future earnings in each of the four plans were made on the same basis, that is, before Federal income taxes. This undoubtedly was true with respect to the estimates of $1,268,000 in the first plan and of $2,300,000 in the fourth plan. In connection with the estimate of $1,500,-000 in the second and third plans, the Commission did not state whether it was before or after income taxes. However, in a footnote to the fourth plan, (see Document 938 of the Reorganization Proceedings, page 153, also text, page 169) it stated that the estimate of $1,-500,000 for those plans was *after* income taxes. Upon this basis the before-tax earnings of an estimate of $1,500,000 after taxes would be $1,833,000 and the multiplier would be 22¼ instead of 27 and the capitalization rate, 4½% instead of 3¾%.

the present 5% bondholders not at all. The two amounts simply cancel. In essence, therefore, A.C.L. is not really paying $4,-000,000 in additional money. In determining what the bondholders are to receive, this $4,000,000 should be eliminated from consideration, which will of itself reduce the consideration to be awarded the 5% bondholders to $42,500,000. These stations when built will of course become the property of A.C.L. under the plan.

5. There is another interesting aspect of this $4,000,000. On December 14, 1945, there was a substantial amount of surplus cash on hand, subject to the lien of 5% bondholders, which ordinarily would have been used to pay defaulted interest on these bonds. It was considered prudent by the parties, however, and by the Court, to use this surplus cash to buy up senior 4½% first mortgage bonds, and thus save as far as possible the interest requirements thereon, which aggregated $540,000 annually. Accordingly, the Court authorized the reorganization trustees to purchase first mortgage bonds "for the account of and in the interest of" the 5% bondholders and to "keep them alive under an express trust for the benefit of" the 5% bondholders, whose money was to be used to buy them. Under this order an aggregate of $3,811,-000, par value, of first mortgage bonds have been purchased by the trustees and are now held for the purpose stated. The fourth plan requires that this $4,000,000 cash payment by the Coast Line be used as far as necessary to repay the 5% bondholders for funds so advanced, and that the first mortgage bonds be retired. Here again, to the extent of $3,811,000, the 5% bondholders would get no new benefit from this $4,000,-000, as they would simply be receiving back that which is already theirs—namely, the money subject to their lien originally used to purchase the first mortgage bonds.

6. This leaves $189,000 out of the $4,000,000, which under the plan would take the following course. Up until April 8, 1947, an internal reorganization was in prospect. Prior to that date, when new equipment or improvements to the road became necessary or desirable, they were paid for from surplus cash on hand which would otherwise have been available to pay defaulted interest on the 5% bonds. This was satisfactory to the bondholders because under a plan of internal reorganization they would own and receive the benefit of the improvements and equipment so purchased. When, however, on April 8, 1947, the Commission approved the so-called third or Coast Line plan, under which a complete stranger was to take over the property, the whole picture changed. It would be manifestly unjust and inequitable thereafter to take monies to which the 5% bondholders were presently entitled and use it to pay for improvements and new equipment which would pass to the ownership of the newcomer who was to take over the road and from which the 5% bondholders would receive no benefit after the plan became effective.

To meet this situation, beginning on July 17, 1947, and thereafter until the present time, in authorizing the use of such funds for the purchase of equipment or the making of improvements from time to time, the Court has provided in its orders that such funds shall be deemed to have been advanced by the 5% bondholders, "who shall be reimbursed therefor and who shall have a lien upon the cash and property of the debtor to the extent of said advances, which lien shall be superior to any interest in the property acquired through reorganization."

Under such orders, funds aggregating $6,250,988 have been expended from earnings, the present depreciated value of which is $5,261,436, for which the 5% bondholders have a lien against all monies and property of the debtor. The improvements purchased with this money were desirable, but not sufficiently indispensable to rank the cost thereof above the bondholders' lien. It is only equitable that if the A.C.L., or any other outsider, is to now take over the property, the 5% bondholders should be reimbursed, not in securities of fluctuating and debatable value, but in cash or its unassailable equivalent, for their funds which were taken from them in cash, and this ahead of any interest acquired by an outsider through reorganization. It cannot be questioned that an outsider taking over this

property should reimburse these 5% bondholders, at the depreciated value of the property as of the time of taking. Such is the equity of the situation, and such is the clear purport of the Court's orders.

The fourth plan provides that the above mentioned balance of $189,000 out of said $4,000,000 shall be applied in reduction of said liens, and that if, after such application of cash, any such liens shall not have been fully discharged—which it was perfectly obvious they would not be—the remaining amount of such liens "shall not be disturbed," and the amount of A.C.L. Divisional First Mortgage bonds awarded to the 5% bondholders shall be reduced by a corresponding amount, thus leaving the bondholders under the necessity of enforcing their liens against the property. How this is to be done does not appear by the plan, except that A.C.L. "may" sell bonds and pay the liens from the proceeds. Thus, in order to retain the liens that the Court has repeatedly held they are entitled to, the 5% bondholders must give up a corresponding amount of new securities which they would otherwise receive. If they keep the liens they lose the new securities. If they take the new securities they lose the liens. In effect, the Commission thus cancels the liens, to which these bondholders are clearly entitled as against an outsider taking over the property.

This does not meet the equities of the situation. What was taken from the 5% bondholders was cash. They are entitled to be reimbursed in cash, or its clear equivalent. It does not suffice to give them A.C.L. securities, nor a potential law suit to enforce their liens. The 5% bondholders are entitled to have back out of the property, in cash or its clear equivalent, the depreciated value of the sums so taken from them, before a stranger takes over the property. This Court has repeatedly so indicated to the parties in denying the Coast Line's several motions to delete the lien clause from the orders authorizing expenditure of the funds. It is the Court's duty to see that these liens, which it has imposed and to which these bondholders are clearly entitled, are respected and enforced now, and that the bondholders be not relegated to a mere law suit in an effort to recover that to which they are presently entitled.

■ 7. The Commission found that unification of F.E.C. with A.C.L. would result in annual operating savings of $925,000, to the benefit of one-half of which, or $462,500, the 5% bondholders would be entitled, and that this should be reflected in the price to be paid by the Coast Line for the property. These savings, the Commission held, should be capitalized at 6.3%. This would produce a capital value of $7,337,300. Instead of adding this to the capitalized value of the property, however, which would have raised that value to $53,337,300, the Commission added to capitalized value only $500,000, barely more than one-half of one year's savings, and awarded the 5% bondholders $7,340,000 in Coast Line securities,—two-thirds in the proposed A.C.L. divisional *income* (not fixed interest) bonds, and one-third in A.C.L. common stock. The Court finds that this is not an equitable recognition of the 5% bondholders' rights as to such savings. If, as the Commission found, the bondholders are entitled to the benefit of one-half of these savings capitalized at 6.3%, then they are entitled to them on that basis, not on some basis of substituted securities, dependent on earnings, which may or may not give them the same benefit. In its sixth supplemental report, the Commission undertakes to explain that this apparent discrepancy is remedied by an improvement in the "quality" of the securities to be awarded the 5% bondholders. But the explanation leaves the reader still in need of further light.

Moreover, if this sum of $7,340,000, fixed by the Commission itself to represent unification savings, be deducted from the total valuation ($46,500,000), it leaves a value for the remainder of the property of only $39,160,000. Yet, in the 1947 plan, *which included no capitalized value for savings,* the Commission valued the property at $40,500,000. Thus, it appears that the bondholders are receiving, for the property itself, $1,340,000 less under the fourth plan

than under the third. This is made more graphic by setting it up as a simple table, as follows:

| Third Plan Valuation | Fourth Plan Valuation |
|---|---|
| $40,500,000 | $46,500,000 |
| | Less capitalization of savings for which nothing was included in the third plan.... $ 7,340,000 |
| | Net valuation of the property itself .............. $39,160,000 |

If from the above computed value of $39,160,000, there is also deducted the $4,000,000 of purported value which is cancelled by a like amount to be received in cash by A.C.L. from the debtor's estate for working capital and the erection of new stations, the remaining value of all the other property and assets would be reduced to $35,160,000. If from this is deducted the $3,811,000 which is specifically allocated by the fourth plan to repay the 5% bondholders for a corresponding sum of their own money used to purchase first mortgage bonds for their account and benefit, the present capital value of the property is reduced to $31,349,000. Some railroad statisticians will no doubt find much fault with this computation, but it serves in a general and homely way to illustrate the strikingly low valuation placed by the Commission on this property, which now includes approximately $20,000,000 in cash and supplies on hand, 366 miles of modern, rock ballasted, double-track railroad, besides a substantial mileage of single tracks and passing tracks, and all the modern rolling stock and equipment that goes with it. It represents a total cash investment of $94,546,701.36, exclusive of the cost of the now abandoned Key West extension. The depreciated book value of the property as of December 31, 1950, is $82,926,237.89, exclusive of cash on hand of about $17,500,000. All this the Commission now values at $46,500,000 for purposes of reorganization, and proposes to compel the present owners, over their objection, to sell it to A.C.L. at that price. Yet the value of this same property for rate making purposes, fixed by the Commission itself, is in excess of $78,000,000,

and its junk value, for materials alone, excluding erection costs, is $48,000,000.

8. According to the Commission, the above mentioned unification savings are to be achieved largely by consolidation of accessory facilities and by the ultimate elimination of at least 319 over-lapping employees. No doubt most, if not all of these, will be F.E.C. employees. It is not likely that A.C.L. will displace its own employees in order to retain F.E.C. employees.

F.E.C. employees, represented by Railway Labor Executives' Association, and others, vigorously—and with reason—oppose the proposed merger. The employees are entitled to consideration in the plan of reorganization, because their jobs and seniority rights are at stake. In determining the public interest, the welfare and morale of the employees is an important consideration. If A.C.L. takes over F.E.C., the present principal overhaul shops and general offices of the latter now located at St. Augustine, where most of the employees live, and many own their homes, and to some extent the Bowden Yards south of Jacksonville, and the Divisional Shops at New Smyrna, would ultimately and to some extent be consolidated with A.C.L. shops and offices at Jacksonville, Waycross, Ga., and Wilmington, N. C., the latter being the headquarters of A.C.L., and thus adversely affect many employees in their living arrangements, as well as in their seniority rights as employees, even if they do not lose their jobs outright. The A.C.L. officials deny that this will occur, but the finding of the Commission of savings to be effected by reducing the employees by at least 319, is ominous.

9. It has already been shown that the annual normal net income of $2,300,000 fixed by the Commission is not supported by the evidence. Under the fourth plan, the benefit of any earnings, or of any additional savings, in excess of the Commission's estimate, goes irretrievably to A.C.L. for all time to come. There would be no opportunity for the present security holders to share in it, except in a diluted ratio as stockholders in A.C.L. Thus, the bondholders take all the chances of the accuracy of the Commission's predictions, as the

prospect of the earnings falling below $2,-300,000 is, under the evidence, too remote for serious consideration.

10. In 1950–1951 when the present plan was being formulated, the Commission had before it a plan proposed by the duPont interests under which the duPonts agreed to accept all common stock in a reorganized company in lieu of their present $25,000,-000 of 5% bonds, giving to all other bondholders new 4% fixed interest first mortgage bonds, which would be worth par, on a dollar for dollar of principal basis of exchange. Thus, the minority 5% bondholders would receive more and better bonds than under the Coast Line plan, and would be assured of a good return on a sound investment, while the duPont interests would take all the chances as to earnings. The minority 5% bondholders enthusiastically favored and urged this plan. But the Commission rejected it in favor of the Coast Line plan, under which these bondholders would receive less, because the Commission found that the public interest required operation and control of F.E.C. by A.C.L. Thus the Commission distinctly subordinated the property rights of the 5% bondholders to the supposed public interest, which the opinion of Judge Hutcheson on the former appeal makes it crystal clear should not be done, but that a reorganization under Sec. 77 should respect the rights of creditors equally with the public interest.

11. The Coast Line, as an unsecured creditor, may not participate in the debtor's mortgaged assets which are less in value than the mortgage debt, unless the debt be paid in full, either in cash or in new securities of equal worth and having the same priority as the old securities to be displaced.[13] Yet the effect of the fourth plan is to divest the 5% bondholders of their present equitable ownership of the mortgaged property and vest it in the Coast Line free of the mortgage lien, for a consideration less than the mortgage debt.

12. The Commission's findings as to public interest are wholly unsupported by evidence.

In submitting the first and second plans of reorganization, the Commission held in effect that operation of Florida East Coast Railway by the duPont interests (St. Joe Paper Company) which would have been the majority stockholder under those plans, would be compatible with the public interest. In this respect, the factual situation is the same now as it was then (1945), except for the advent of the Atlantic Coast Line upon the scene.

In submitting the third and fourth plans, under which ownership and control are awarded to Atlantic Coast Line, the Commission finds that control of Florida East Coast by St. Joe Paper Company would be contrary to the public interest, a clear reversal of its former position. The reasons assigned for this holding are:

(a) That "there is an inherent weakness in independent stub-end railroads, such as the Florida East Coast."

(b) That the duPont interests, because of their ownership of a chain of Florida banks, would be enabled to influence shippers to route their shipments over some carrier which the duPonts might wish to favor, and that this wide-spread banking influence might have "grave consequences" against which it would be impossible to adequately protect shippers and the public.

(c) That the St. Joe Paper Company and the duPont interests are potentially large shippers over F.E.C., and that advantages might accrue to them as shippers if they controlled the road.

(d) That operating economies will be effected by integration with A.C.L.

As to reason (a): Florida East Coast is the only double track railway in Florida.[14]

13. Northern Pac. R. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931; Kansas City Terminal R. Co. v. Central Union Trust Co., 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028; Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982; Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.

Ct. 1, 84 L.Ed. 110; R. F. C. v. Denver & R. G. W. R. Co., 328 U.S. 495, 66 S. Ct. 1282, 90 L.Ed. 1400.

14. The A.C.L. is double-tracked from Jacksonville to Richmond, of which 36 miles are in the State of Florida, also from Dunnellon to Trilby, Florida,—47 miles.

It owns and operates 366 miles of modern, rock ballasted double track, from Jacksonville on the north to Miami on the south. Jacksonville, the second largest city in Florida, is the industrial and financial center of the State. Miami, the State's largest city, is one of the nation's greatest resort and recreation areas. The most direct railroad connection between these two cities is Florida East Coast. In addition, F.E.C. owns and operates single track branch lines which increase its total operated track to 571 miles.

It traverses the most populous, richest, and fastest growing sections of Florida,— all the tourist resorts along the Florida East Coast and the East Coast citrus growing areas. Its branch lines extend to the fabulously fertile truck growing areas around Lake Okeechobee, where vegetables mature in from 45 to 75 days after planting, and four crops a year are not uncommon. New industries are constantly being located along its lines, one of which alone will produce an annual revenue to F.E.C. of $700,000.

The 1950 population of the Jacksonville metropolitan area is 304,029, increasing to that figure from 210,143 in 1940, a growth of approximately 33⅓%. The 1950 population of the Miami metropolitan area is 495,084, increasing to that figure from 267,739 in 1940, an increase of approximately 85%. From Jacksonville south to West Palm Beach, a distance of 299 miles, F.E.C. has no rail competition whatever, being the only rail carrier operating directly between those cities along the east coast of Florida. Along its route it serves such populous centers as Hollywood, population 14,531; Fort Lauderdale, population 36,328; the Palm Beaches, population 47,048; Daytona Beach, population 30,187; St. Augustine, population 13,555, and many others, all of which are prosperous and growing communities. Its lines are fully protected by the most modern, electrically operated safety system. They have recently been re-railed with new 112 and 115 pound steel rail at a cost of approximately $9,000,000, all paid for out of earnings. Its rolling stock consists largely of Diesel locomotives, the latest and most modern streamlined passenger equipment and adequate modern freight equipment with which it provides fast freight and local service, and with its connecting carriers furnishes daily passenger service in high speed trains from New York, Chicago, and Detroit, via Jacksonville to Miami and intermediate points.

Though the 12 Florida counties served by F.E.C. constitute only approximately 21% of the area of the State, these counties contain approximately 50% of the State's population, produce in value more than 50% of the State's vegetable crop, and 26% of the State's manufactured goods. More than 50% of the State's retail sales are made in these counties, and they have approximately 50% of the income of the State. Retail sales in these counties have increased 320.7% in the past 10 years. In the United States generally, retail sales increased only 206.5%.

The freight tonnage handled by F.E.C. has more than doubled, and the number of passengers carried by it has increased by approximately 50% during the past 10 years. Its passenger revenues have almost doubled, and its freight revenues almost tripled during the same period. Its net operating income during the same period has likewise approximately doubled. Its percentage of increase in tonnage carried during this period exceeds all other Florida lines, including A.C.L., and its gross railroad operating revenues during the past 10 years have increased from $10,748,838.01 to $26,890,357.52 in 1950.

Exhibit No. 191, filed by St. Joe Paper Company at the 1945 I.C.C. hearing, which is the latest information available to the Court on the subject in the record, shows that Florida East Coast Railway, operating 12.74% of the miles of road in the State, represents 28.95% of the rail investment, 19.36% of the assessed valuation, and produced 22% of the freight operating revenues, and 44.5% of the passenger operating revenues, of all the rail lines in the State of Florida.

Yet this is the railroad which the Commission finds to be a "stub-end" railroad, "akin in its economic characteristics to a secondary main line or a major branch line

of a large system," which must be integrated with Atlantic Coast Line in order to enable it to survive. It is difficult to understand how, after rendering satisfactory transportation service to the public for more than 56 years, even during receivership, this road has suddenly become impotent as an independent carrier, and able to continue operation only as a caudal appendage of A.C.L., which now has no line along the east coast of Florida, but is anxious to acquire one. The Commission's conclusion that this is a "stub-end" road with the weaknesses usually inherent in such roads, is simply not supported by the evidence. Every statistical method of appraisal rebuts that conclusion. Of course, the road is now overcapitalized, due to overexpansion during the Florida "boom" of the 1920's, an expansion which then seemed imperative, but which later proved disastrous. This can very readily be remedied by a reduction in the debtor's capital structure appropriate to its present income, with a ratable distribution of the new securities to the present owners.

As to reason (b): The record is devoid of any evidence of actual or potential influence upon shippers by the duPont interests. The Commission's conclusion that the duPonts might attempt to prejudicially influence shippers rests upon mere inference drawn by the Commission from the fact that during the hearings before its Examiner many shippers along the Florida East Coast appeared in support of a plan of internal reorganization, with duPont control, opposing the merger with the Coast Line. From this the Commission infers, without tangible evidence, that these shippers were influenced by the duPont banks to take the attitude just mentioned, and upon this the Commission bases the further inference that if the road passes to duPont control, the duPont banks will be able to exert prejudicial influence upon shippers. The latter is also a conclusion resting upon no tangible evidence.

As to reason (c): Nor does the evidence support the conclusion that St. Joe Paper Company and the duPont banks are potentially large shippers over Florida East Coast who might gain an advantage from control. The manufacturing plant of St. Joe Paper Company is located at Port St. Joe, Florida, 310 miles via railroad from the nearest point on F.E.C. Railway. The evidence shows that during the *five-year* period 1947–1951, freight charges paid for shipments to or from St. Joe Paper Company over the lines of F.E.C. Railway aggregated $3,202.74 for the five-year period. Of this, one shipment of "reinforcing bars" accounted for $2,958.93, leaving what might be termed "ordinary" shipments amounting to $243.81, as the reinforcing bar shipment is an extraordinary one which will probably never recur. During this period, the duPont banks throughout Florida shipped or received merchandise over F.E.C. for which the aggregate freight charges were $4,464.05. During the same five-year period the gross operating revenue of F.E.C. was approximately $137,000,000, of which the duPont interests, as shippers, contributed a total of $7,666.79, or $1,533.16 per year of an average gross revenue for the F.E.C. of $27,000,000. There is no evidence that this situation is likely to change in the future.

As to reason (d): The Commission finds that unification of F.E.C. with A.C.L. would result in annual operating savings of $925,000. It has already been shown that this will be effected largely through the discharge of 319 employees. These prospective savings do not of themselves justify the consequences of the merger upon the employees, nor upon the property interests of the 5% bondholders.

There are other interesting aspects of this proposed merger. Atlantic Coast Line now has no line along the east coast of Florida, but desires to acquire one to extend its system into that territory, and thus enable it to compete with S.A.L. along the lower east coast of Florida. Florida East Coast is the only line available for this purpose.

A.C.L., however, does operate 681 miles of double track road from Jacksonville north to Richmond, with direct, and partly owned, connections to Washington, New York, and the East; also 238 miles of track from Jacksonville to Tampa, with branches to St. Petersburg, Naples, and Everglades City

on the lower west coast of Florida and around the south side of Lake Okeechobee in south Florida; also other lines which connect the above named places, and intervening points, with all the principal cities of the Southeast from Atlanta, Birmingham, Montgomery, and Winston-Salem on the west; to Norfolk, Wilmington, Charleston, Savannah, and Brunswick on the east; in all about 5,453 miles of main line track.

Atlantic Coast Line also owns 35% of the capital stock of Louisville & Nashville Railroad, a carrier operating 4,764 miles of main line track serving the central western portion of the country from Cincinnati to New Orleans, via Louisville, Nashville, Birmingham, and Montgomery; also from St. Louis to New Orleans via Evansville and Nashville; and from Cincinnati to Atlanta via Knoxville. Atlantic Coast Line also owns 50% of the capital stock of Peninsular & Occidental Steamship Company, which operates a steamship line between Miami and Cuba. The remaining 50% of said stock is now owned by Florida East Coast Railway, but would be acquired by A.C.L. if the proposed merger is consummated. Why Atlantic Coast Line desires to add the Florida East Coast Railway to the far-flung system above described, so as to constitute it a competing line from Jacksonville to Miami, with connections to Cuba, is perfectly obvious.

Seaboard Air Line Railway and Southern Railway are competing carriers with Atlantic Coast Line from Jacksonville to the north, east, and central west. These roads now compete with A.C.L. for the interchange business of Florida East Coast at Jacksonville, through the Jacksonville "open gateway" to and from the east coast of Florida. The public now enjoys the benefit of this competition. Seaboard parallels A.C.L. from many Florida points to Jacksonville, also from Jacksonville to Richmond, with the same connections to the north and east. Seaboard and Southern, one or both, serve substantially the same principal cities as A.C.L. to the north and west of Jacksonville. From the interchange traffic at Jacksonville, Southern Railway received in 1949 a total revenue of $5,900,000. The Seaboard received $3,300,-

000. These two lines aggregated $9,200,000, about 57% of the total interchange revenue, the Coast Line and its affiliates having received a total of approximately $7,450,000.

It is obvious that the addition of Florida East Coast to its system would give A.C.L. a tremendous advantage—to say the least of it—over its competitors, the Seaboard and Southern, as to passenger and freight traffic originating along, or destined to, the east coast of Florida and in Cuba. It would effectively close the "open gateway," which now exists at Jacksonville, and give A.C.L. a virtual monopoly over the interchange business at Jacksonville. Apparently the Commission saw no "grave consequences" for the public in this situation. But it finds that because the duPonts control extensive banking resources in Florida—an advantage, it would seem, in operating a railroad —their control over the operation of the F.E.C. would be incompatible with the public interest.

It may be that the coercive possibilities which would accompany absorption of F.E. C. into the Atlantic Coast Line, along with sole ownership of P & O S/S Company, and the potential influence of that set-up upon passengers and shippers as to the carrier they would select to the north, east, or west of Jacksonville, served by A.C.L. and L. & N., would have consequences less "grave" on the public interest than to entrust continued independent control to the present equitable owners of Florida East Coast, whose only disqualification is that some of them own a chain of Florida banks, but such a conclusion is wholly unsupported by evidence in this record. It should here be mentioned again that there are $20,000,000 of minority 5% bondholders who do not own any Florida banks, but who will nevertheless be penalized by the Commission's apprehensions as to the public interest.

With some exceptions, a shipper has the theoretical privilege of routing his shipment as he wishes. As to broken lot shipments, this is a privilege rarely exercised. As to carload shipments, it will hardly be doubted that a shipper who endeavors to procure empty cars from one carrier to be loaded with shipments to be routed over the lines

of a competing carrier will find his path beset with difficulties.

There are other reasons why the fourth plan is unfair and inequitable, but these are enough. The basic inequities for which the third plan was rejected, still persist in the fourth. In fact, the fourth plan is an obvious repetition of the third, with a purported improvement in valuation and securities which really afford the bondholders no genuine advantage over the third. Per contra, the creditors receive less in real worth under the fourth plan. There must be some type of reorganization which will conserve the public interest, and at the same time deal equitably and fairly with the bondholders, but this plan does not do so.

For the same cogent reasons given by Judge Sibley and by Chief Judge Hutcheson as to the third plan, namely, because the fourth plan, as did the third, unjustly and inequitably subordinates the rights of the 5% bondholders, particularly the $20,-000,000 of minority bonds, to the accomplishment of a forced merger with Atlantic Coast Line, which merger seems to he the primary objective of the Commission, and because this Court also finds that in fixing its valuation under the fourth plan, the Commission clearly did not give due consideration to the earning power of the property as commanded by the statute, nor did it follow legal standards, but adopted an arbitrary sum without support in the evidence, the Court rejects the fourth plan (certified October 25, 1951) as unjust, inequitable, and lacking in due recognition of the rights of the 5% bondholders, particularly the $20,-000,000 minority group, contrary to Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205.

This property has been *in custodia legis* more than 20 years. In an effort to expedite the restoration of this property to private operation, this Court, during hearings held pursuant to its order of February 28, 1939, advised the parties that they must either proceed promptly with the foreclosure of the defaulted 5% mortgage, or commence a Section 77 reorganization in bankruptcy. The creditors on January 25, 1941, commenced this proceeding under Section 77, which now has been pursued to an apparent impasse. The matter is now exactly where it was on January 25, 1941, when the bankruptcy reorganization was commenced. The Court has heretofore disapproved two plans and twice before referred the matter back to the Commission in an unsuccessful effort to secure a plan of reorganization the Court could approve.[15] This is the third plan to be disapproved.

Section 77, sub. e, provides: "If the judge shall not approve the plan, he shall file an opinion, stating his conclusions and the reason therefor, and he shall enter an order in which he may either dismiss the proceedings, or in his discretion and on motion of any party in interest refer the proceedings back to the Commission for further action, * * *."

Section 77, sub. g, provides: "If in the light of all the existing circumstances there is undue delay in a reasonably expeditious reorganization of the debtor, the judge, in his discretion, shall (not may), on motion of any party in interest *or on his own motion* (italics supplied), after hearing and after consideration of the recommendation . of the Commission, dismiss the proceedings."

15. The reorganization problem was originally referred to the Commission on January 25, 1941. The first proposed plan was certified by the Commission to the Court August 10, 1942. This plan was rejected by the Court and the matter referred back to the Commission, October 19, 1943. The second plan was approved by the Commission, January 8, 1945, but on July 20, 1945, the Commission reopened the entire proceedings and held further extended hearings beginning November 6, 1945, which culminated in the third or A.C.L. plan, which was finally certified to the Court, March 25, 1948. The third plan was rejected by this Court, and the matter again referred to the Commission, January 22, 1949. The fourth amended plan, now before the Court, was approved by the Commission, July 12, 1951, and certified to the Court for consideration, October 25, 1951. Thus have 11 years been consumed.

Thus the statute expressly contemplates that the Court may dismiss a Section 77 proceeding either if the Court disapproves the plan, or if the proceeding is productive of undue delay. Both these conditions exist here.

There are now before the Court motions to dismiss the Section 77 proceeding filed by 75.5% of the First and Refunding bondholders who appear for that purpose in person or by attorney, also by an additional 23.5% represented by the trustee for those bonds, aggregating 99% of the 5% bondholders, all of whom oppose the Commission's fourth plan, but who apparently will be able to agree upon a plan of their own which will assure a prompt reorganization of the debtor in equity through a foreclosure and sale under the 5% mortgage.

The Court feels that 11 years is long enough, especially following nearly 10 years of equity receivership, to continue its attempt to accomplish a Section 77 reorganization, and that it should now restore this railroad to private operation by the most expeditious course consistent with both the public and private interests involved. Three years have now elapsed since the third plan was rejected.

In the circumstances, the Court feels that this result can be best achieved through a prompt foreclosure of the 5% mortgage, to which these creditors are both legally and equitably entitled, and which will enable the Atlantic Coast Line, the 5% bondholders, the employees, and any other interested persons, to bid for the property at a public, competitive sale.

To that end, it will be ordered that effective June 1, 1952, at 12:01 a. m., the petition in bankruptcy shall stand dismissed, and the reorganization trustees directed to restore all property and records of the debtor to Scott M. Loftin and John W. Martin, as receivers in the 5% mortgage foreclosure, as expressly authorized by Sec. 77, sub. i, which receivership, still in existence though for the time being suspended, will be re-activated in all respects as it was on January 25, 1941, when it was superseded by Section 77 reorganization proceedings. These equity receivers will be directed to take charge of and operate the property under and pursuant to all orders of the Court in effect on January 25, 1941, as to said equity receivership, and any pertinent orders made in the bankruptcy proceedings since that time.

The plaintiffs in the 5% mortgage foreclosure will be directed to amend their complaint as they may be advised on or before May 1, 1952, and the defendants therein will be directed to file their answers to said complaint on or before June 1, 1952, after which the Court intends to proceed, as expeditiously as is possible and just, to foreclose the 5% mortgage and sell the property, at public and competitive sale, to the highest and best bidder who can demonstrate its ability to continue to operate the road and to satisfactorily serve the public interest, subject to the approval of the Commission under Section 20a of the Interstate Commerce Act, 49 U.S.C.A. § 20a, as to the reasonableness and adequacy of any new securities to be issued by the purchaser, and subject also to any other applicable provisions of said Act.

Judgment accordingly.